[No. 56502-3. En Banc. February 14, 1991.]

THE STATE OF WASHINGTON, *Respondent,* v. MICHAEL DUANE EARLS, *Appellant.*

*Michael Duane Earls,* pro se, and *Julie A. Kesler* of *Washington Appellate Defender Association,* for appellant.

*Michael E. Rickert, Prosecuting Attorney,* and *David R. Needy, Deputy,* for respondent.

DURHAM, J.—Michael Duane Earls was convicted by jury of one count of premeditated first degree murder and was sentenced to 340 months in prison. Earls appeals his conviction, asserting that the trial court erred in denying his motion to suppress the confession he made to the police. He claims that the statements were made after an invalid waiver of his rights under article 1, section 9 of Washington's constitution, which protects against self-incrimination. Holding that Earls' waiver was made freely, knowingly, and voluntarily, we affirm.

Earls does not challenge the sufficiency of the evidence sustaining his conviction other than as it pertains to the issue of his waiver. Thus, we discuss only those facts relevant to the trial court's denial of Earls' motion to suppress his statements.

On March 31, 1987, Roy Alaniz was shot while in his home in Sedro Woolley.[1] Alaniz was taken to a hospital, where he died the next day from a gunshot wound to the head. Detective Kenneth Rosencrantz of the Sedro Woolley Police Department was in charge of the investigation of the Alaniz death, which was determined to be a homicide. On December 7, 1987 a confidential informant told the Sedro Woolley Police Department of a possible suspect in the Lynnwood area. This information led them to talk with

---

[1] Earls shot Roy Alaniz in exchange for money and forgiveness of a drug debt. Earls had stolen $5,000 worth of drugs from Alaniz and his wife, Delia. Delia told Earls that he would not have to pay back the money for the drugs if he would kill her husband.

Earls' girl friend, Cindy Neal. Based on the interview with Neal, Rosencrantz determined that there was probable cause to arrest Earls for the murder of Alaniz. On January 21, 1988, at approximately 12:30 p.m., Detective Gary Northrup of the Lynnwood Police Department, accompanied by Rosencrantz, arrested Earls. Northrup advised Earls of his constitutional rights at the time the arrest was made. Earls was then taken to the Lynnwood Police Department.

The parties have stipulated that Earls called his ex–wife, Valerie LaPier, from the jail at 1:50 p.m. that same day. Earls testified that he told the booking officer that he wanted to call LaPier so that she could contact an attorney. He also testified that the call was made in the presence of the booking officer and that the booking officer dialed the phone. Rosencrantz testified that he was not sure if the booking officer usually dials these calls. Because Earls did not mention this call to his attorney until shortly before the April suppression hearing, defense counsel did not question police department personnel about it until some 3 months after Earls' arrest. The parties stipulated that the booking officer has no independent recollection of this call.

Earls further testified that he told LaPier that he was at the police station and that he said, "I don't know what they have me here for but I need a lawyer."[2] He testified that LaPier told him that she was quite sure she could find someone.

Valerie LaPier testified that she received a call from Earls shortly after lunch on the 21st, and that Earls said that he was in jail charged with murder and that he needed an attorney. LaPier got the name of Robert Leen from an

[2]Earls initially testified that he was not sure when the police first told him that he was under arrest for murder, but he believed Rosencrantz told him at the police station. When questioned further, he said that the first time he was told that the police had arrested him for murder was after he had called LaPier, when Rosencrantz began his interview. When Earls was made aware of the conflict between his testimony and that of LaPier and Robert Leen, the attorney LaPier contacted, Earls said it was possible he had been told earlier.

attorney at the law firm where she is employed as a para-legal. Because Leen was not in his office when she called, she left a message. LaPier testified that Leen returned her call between 4:30 and 5 p.m. LaPier then told Leen that her ex–husband was in jail and charged with murder. She said that Leen said that he would "call and try to find out what was going on."

Robert Leen testified that, while he did not recall the specific date, he did receive a call from Valerie LaPier. He confirmed that LaPier told him that a boyfriend was charged with murder and that she asked if he was inter-ested in representing him. His response to her was "yes, I would—I needed to find out what was happening." He then called the Lynnwood Police Department. Leen testified that he identified himself and stated that he was calling for Earls and that a friend had contacted him on Earls' behalf. He asked to speak to Earls, but was told that he could not. He then asked to leave his name and number so the police could have Earls call him back. He testified that he called the station before 5 p.m., but could not be more specific about the time.

Leen did not say that he was Earls' attorney or that he did not want the police to talk to Earls. "All I ever repre-sented was that I was contacted by his family or friends." He made no attempt to go to the station or see Earls first-hand. Leen did not consider himself retained at that point. LaPier also testified that Leen was never hired. Earls does not claim that Leen was ever retained to represent him.

Leen testified that Earls called him back at 8 or 9 o'clock that evening and told Leen that he had confessed and he did not think there was anything Leen could do. Earls tes-tified that he did not call Leen until the next day. Leen then spoke to LaPier who told him that she was not sure if they would hire an attorney or try to get a public defender.

Leen heard nothing further regarding Earls until about 3 months later. He had not made any notes regarding the calls. Leen testified that his first impression was that Earls

was being interviewed by the police when he called. However, he then testified that he could not recall for sure whether he had been told that the police were interviewing Earls, that Earls was unavailable, or that calls could not be transferred to the jail.

At about 4:43 p.m. on the day of his arrest, Earls was taken from his cell and brought into a private office at the Lynnwood Police Department to be interviewed by Detective Rosencrantz. No one else was present in the room. Rosencrantz testified that he read Earls his constitutional rights from a pocket rights card at the beginning of the interview. It is undisputed that Rosencrantz re–advised Earls of his constitutional rights at 5:21 p.m. and that Earls signed a written waiver at that time.

At 5:25 p.m., Rosencrantz began a taped interview. Immediately prior, an agreement was reached that Earls would not be charged with aggravated first degree murder, which carries a penalty of death or life in prison without parole. At the beginning of the tape, Earls was again advised of his rights. It is undisputed that Earls did not invoke his constitutional rights at any time during the interview with Rosencrantz. Earls testified that during the interview he at no time asked for an attorney, stated that he was waiting for a call from an attorney, or in any way indicated that he did not want to answer questions.

Rosencrantz testified that he was not in the booking room when Earls called LaPier nor was he aware that Earls had called LaPier to see if she could get an attorney. While he was aware that Earls had made a call, he had no knowledge of the content of the call. Rosencrantz was not made aware of Leen's call until 2 weeks before the suppression hearing.

The parties have stipulated that no one at the police station has independent recollection of Leen's call coming in; that there is no record of the call because the message pad used at the booking desk is routinely destroyed every third day or so, unless a request is made to save a particular

message; and that incoming calls can be transferred back to the jail.

Prior to trial, Earls filed two motions to suppress, one as to his statements and another as to all the evidence resulting from his arrest, which he contended was illegal. Earls challenged the existence of probable cause for his arrest and the authority of the Lynnwood Police Department to make the arrest.

After a hearing, the trial court denied both motions. In so doing, the court signed two orders. The first referred specifically to the CrR 3.5 hearing, which was held to determine the admissibility of the statements. The second dealt with both motions. The court specified that the two orders "should be read together and not separately" because, while the phone call by Leen was addressed only in the second order, facts relevant to the voluntariness of Earls' statement are contained in both.

In the first order, the court listed the following undisputed facts: At the time of his arrest, Earls was advised of his constitutional rights by the Lynnwood police; at 4:43 p.m., Earls was taken from his cell to be interviewed by Rosencrantz; at 5:21 p.m., Rosencrantz re–advised Earls of his constitutional rights and Earls executed a written waiver; at 5:25 p.m., the taped interview was started and Earls was advised of his rights on the tape; Earls never invoked his constitutional rights during the interview; and the interview tape was made after an agreement was reached not to charge Earls with aggravated murder. The testimony given at the hearing conflicted as to whether or not Earls was under the effect of barbiturates during the interview and was advised of his rights when the interview began at 4:43 p.m. There was also a dispute as to who first suggested that Earls give a statement in exchange for a reduced charge.

The trial court entered the following conclusions: There was insufficient evidence that Earls was intoxicated or that his will was affected by drugs; Earls was verbally advised of

his rights at 4:43 p.m.; Earls was the first to suggest a confession in exchange for avoiding the death penalty or a sentence of life in prison without parole; Rosencrantz did not threaten Earls with the death penalty or life in prison without parole unless he confessed; and Earls' statement was not induced by threat or promise. Earls has not assigned error to any of these conclusions.

The court went on to conclude that Earls' statement to Rosencrantz was "given freely and voluntarily after proper advisement of constitutional rights and a knowing waiver of those rights" and Earls "never exercised any of his rights during the interview with Detective Rosencrantz." The court ordered that Earls' "oral and written statements made to Detective Rosencrantz between 4:43 p.m. and 7:56 p.m. on January 21, 1988 [were] admissible at the time of trial."

The second order signed by the court dealt with the issues of probable cause, the Lynnwood police's authority to arrest Earls, and the validity of Earls' waiver. As to waiver, the court addressed three areas of dispute—Earls' possible intoxication, inducement of his statements by promise or threat, and the effect of the phone call by Leen on the validity of his waiver.

As to the intoxication issue, the court found insufficient evidence that Earls was intoxicated or that his will was affected by drugs. The court further found that Earls' statement was made after he initiated the request for a first degree murder charge, rather than aggravated first degree murder, and that the statement was not induced by any threat or promise. Earls has not assigned error to either of these findings.

The court then stated:

> The third area surrounding the defendant's statement involves a phone call made slightly before 5 p.m. on January 21, 1988 to the Lynnwood Police Department. The call was made by Robert Leen who identified himself as an attorney contacted by Michael Earls' family and requested to talk to the defendant. When told the defendant was unavailable (possibly because he was talking to detectives), Mr. Leen simply left a

message for the defendant to call when he was available. Mr. Leen made no attempt to contact the officers involved or to stop the interrogation. He asserted no rights on behalf of the defendant or make [sic] any effort to clarify the circumstances.

Under the facts and circumstances before the Court, the timing of Mr. Leen's attempted contact, the manner in which it was made and the previous knowledge of the defendant do not negate the defendant having knowingly, freely and voluntarily waived his constitutional rights. This finding is further supported by *Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

Clerk's Papers, at 107–08. The court concluded that the statement was given freely and voluntarily after Earls executed a knowing waiver of his constitutional rights and ordered that the statements were admissible at trial.

Earls assigns error only to the trial court's finding that Leen's call did not negate the validity of Earls' waiver and the conclusion that his statements were therefore admissible.[3] Earls does not contend that he was unaware of his rights, that he was unable to understand them, or that he was incompetent to waive them.[4] Nor does he argue that he invoked his right to an attorney by calling LaPier, while at the same time not telling Rosencrantz that he had attempted to contact an attorney, despite being advised of his rights three times prior to making the statements. Rather, he urges this court to hold that, as a matter of state law, an otherwise valid waiver of constitutional rights is

---

[3]Earls has not assigned error to any of the findings of fact entered after the suppression hearing. Thus, they are verities on appeal. *State v. Harris,* 106 Wn.2d 784, 725 P.2d 975 (1986), *cert. denied,* 480 U.S. 940 (1987); *State v. Christian,* 95 Wn.2d 655, 656, 628 P.2d 806 (1981).

[4]We note that in considering if Earls knowingly and voluntarily waived his constitutional rights to counsel and to remain silent, we may consider his familiarity with police interrogation procedures by virtue of his having been previously convicted and served time in prison. *State v. Vangen,* 72 Wn.2d 548, 554, 433 P.2d 691 (1967). Rosencrantz testified that his background check on Earls revealed that Earls had been released from the Washington State Penitentiary in either December 1986 or January 1987. Earls had served 9 years of a 10–year sentence for robbery and assault. Earls' past record also indicated that he had been investigated for homicide in Seattle. Earls testified that because he had been arrested before, he had been advised of his rights prior to his arrest on January 21, 1988.

vitiated if police officers do not inform a suspect of the efforts of an unretained attorney to contact him.

As a threshold matter, it is essential that we clarify exactly which constitutional provisions are at issue. This need for precision is especially crucial when we are asked, as in this case, to interpret our state constitution to afford broader protection than its federal counterpart. When a party urges this court to undertake such an independent state analysis, it is important that we identify on which provision the party relies and the extent of additional protection being urged.

██ Earls complies with this, but only in the most general sense. He alleges that this court should hold that his waiver is invalid because his constitutional right to counsel has been violated. However, as is frequently the case when a party's right to counsel is at issue, Earls appears to have blended the right to counsel under the Fifth and Sixth Amendments (and their state constitution counterparts) into a generic right to counsel argument. This is an especially easy trap to fall into when one is arguing the validity of a waiver, rather than a direct violation of the right to counsel. Here, Earls' waiver was made and his statement was given before formal charges were filed. Thus, his right to counsel under the Sixth Amendment and Const. art. 1, § 22 (amend. 10) had not yet attached.[5] Earls did, however, have a Fifth Amendment right to counsel at the

---

[5]It has been firmly established that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the initiation of adversary judicial criminal proceedings against the defendant by way of formal charge, preliminary hearing, indictment, information, or arraignment. *Kirby v. Illinois*, 406 U.S. 682, 688–89, 32 L. Ed. 2d 411, 92 S. Ct. 1877 (1972). The right to counsel under Const. art. 1, § 22 (amend. 10) also attaches only after the initiation of formal judicial proceedings. *Heinemann v. Whitman Cy.*, 105 Wn.2d 796, 799–800, 718 P.2d 789 (1986); accord, *Tacoma v. Heater*, 67 Wn.2d 733, 736, 409 P.2d 867 (1966) (right to counsel is the same under the Sixth Amendment and Const. art. 1, § 22 (amend. 10)). Earls does not argue otherwise.

In urging this court to undertake an independent state analysis to resolve the issue of the validity of his waiver, Earls does refer to article 1, section 22. However, he does not ask this court to hold that the right to counsel should attach earlier under the state provision than under its federal counterpart.

time of his waiver because it was given during a custodial interrogation. The right to have counsel present during custodial interrogation is indispensable to the protection of the Fifth Amendment right against self–incrimination. *Miranda v. Arizona,* 384 U.S. 436, 469, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966). Accordingly, our discussion is limited to Earls' right to counsel under the Fifth Amendment and our state counterpart, Const. art. 1, § 9.

Earls asks that we decide the validity of his waiver under our state constitution, rather than federal law. He claims that article 1, section 9 should be interpreted as more protective than its federal counterpart. Article 1, section 9 provides:

> No person shall be compelled in any criminal case to give *evidence* against himself . . .

(Italics ours.) The Fifth Amendment provides:

> . . . nor shall [any person] be compelled in any criminal case to be a *witness* against himself . . .

(Italics ours.)

█ Whenever a claim of right is asserted under the Washington Constitution, the first step is to determine if the asserted right is more broadly protected under the state constitution than it is under federal constitutional law. *Forbes v. Seattle,* 113 Wn.2d 929, 934, 785 P.2d 431 (1990). Earls urges this court to make this determination using the analysis set forth in *State v. Gunwall,* 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986).[6] However, resort to the *Gunwall* analysis is unnecessary because this court has already held that the protection of article 1, section 9 is coextensive with, not broader than, the protection of the

---

[6]*Gunwall* enumerated six nonexclusive neutral criteria that must be addressed before this court will undertake state constitutional analysis: (1) the textual language of the state constitution; (2) significant differences in the texts of parallel provisions of the federal and state constitutions; (3) state constitutional and common law history; (4) pre–existing state law; (5) differences in structure between the federal and state constitutions; and (6) matters of particular state interest or local concern. *Gunwall,* at 61–62.

Fifth Amendment. *State v. Moore,* 79 Wn.2d 51, 483 P.2d 630 (1971).

In *Moore,* appellant challenged the constitutionality of Washington's implied consent law contending that it impermissibly impliedly waived his privilege against self–incrimination.[7] The court noted, and appellant agreed, that the privilege against self–incrimination embodied in the Fifth Amendment extends only to testimonial or communicative evidence and does not protect an accused from being the source of real or physical evidence against himself. *Moore,* at 55 (citing *Schmerber v. California,* 384 U.S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826 (1966); *United States v. Wade,* 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926 (1967)). *Schmerber* held that blood tests to determine alcoholic content are not testimonial or communicative in nature and, thus, compelling such tests does not violate the Fifth Amendment. *Schmerber,* at 765. However, appellant urged the court to hold that compelling a Breathalyzer test violated his privilege against self–incrimination under article 1, section 9.

Appellant argued that the difference in language between the two provisions should be interpreted as granting broader protection under article 1, section 9. The court assessed the textual difference in the two provisions as follows:

> [Moore] presents an articulate argument for the proposition that we are not bound to place the same interpretation on our state constitutional privilege against self–incrimination as has been placed on that contained in the United States Constitution. He reasons that our provision, which is worded in terms of giving *evidence,* should be interpreted by this court to include physical evidence because our provision is meant to grant a broader protection than that granted by the Fifth Amendment. We are not persuaded, however, that the difference in language between the two constitutional provisions is determinative.

[7]Under RCW 46.20.308, all drivers are deemed to have given consent to a chemical test of their blood or breath to determine the alcohol content of their blood if they are arrested and the arresting officer has reasonable grounds to believe they had been driving while under the influence of intoxicating liquor.

> While it may be granted that the words "evidence" and "witness" are not synonymous in terms of standard dictionary definition, this court must interpret specific words of the state constitution in consonance with the principles of law which they are used to express.

*Moore,* at 55–56. The court also looked to the origins of the privilege against self–incrimination and the manifest purpose of state and federal provisions protecting the privilege. It concluded that both the state and federal provisions are meant to prohibit the compelling of self–incriminating testimony from a party or witness. *Moore,* at 56. The court stated:

> The Washington constitutional provision against self–incrimination envisions the same guarantee as that provided in the federal constitution. There is no compelling justification for its expansion. The protection of both constitutional provisions extends only to testimonial or communicative evidence.

*Moore,* at 57.

It is of particular interest that a dissent authored by Justice Rosellini thoroughly presented arguments in favor of broader state protection. *Moore,* at 65–68 (Rosellini, J., dissenting). Indeed, the dissent's analysis in many ways foreshadowed the analysis later set forth by this court in *Gunwall.* Nonetheless, the 6–person majority remained unconvinced.

The dissent first criticized the *Schmerber* holding that blood tests to determine alcoholic content do not fall within the ambit of the Fifth Amendment. Noting that this court was not bound to follow *Schmerber,* it urged the court to hold that the implied consent law violated article 1, section 9. The dissent advanced a number of arguments in support of interpreting the state provision more broadly than its federal counterpart.

First, it contended that the word "evidence" supported interpreting our state provision more broadly than the federal because the commonly accepted meaning of evidence encompasses all kinds of evidence, testimonial and physical. *Moore,* at 65 (Rosellini, J., dissenting). The dissent noted that the members of the Washington State Constitutional

Convention deliberately rejected the word "testify" in favor of the word "evidence". *Moore,* at 65 (Rosellini, J., dissenting) (citing *Journal of the Washington State Constitutional Convention, 1889,* at 498 (B. Rosenow ed. 1962)).

Next, the dissent reiterated that this court is not bound to follow federal analysis solely because the provisions at issue are similar. While acknowledging that this court has recognized the *Schmerber* distinction between physical and testimonial evidence, it asserted that pre–existing state law had done "no more than hold that bodily exhibition tests are not within the protection of the constitution" and were, therefore, distinguishable because they "did not involve the use of substance of a person's body against him, such as liquid (blood) or gas (breath)." *Moore,* at 66 (Rosellini, J., dissenting). The dissent had previously noted that, prior to *Schmerber,* several state courts had held that there was no constitutional difference between requiring submission to chemical tests and coercing spoken testimony. *Moore,* at 61 (Rosellini, J., dissenting).

The dissent concluded that, contrary to the majority's position, the problems it saw with *Schmerber* were "compelling justification" for the expansion of the protections of article 1, section 9 beyond the boundaries proscribed for the federal provision. *Moore,* at 66, 68 (Rosellini, J., dissenting). In spite of the strong arguments he presented, Justice Rosellini was unable to persuade a majority of the court to adopt his position.

The issue was revisited in *State v. Franco,* 96 Wn.2d 816, 639 P.2d 1320 (1982). This time a unanimous court concluded that *Moore* correctly interpreted article 1, section 9, stating: "We decline to overrule *Moore,* which is stare decisis on this issue." *Franco,* at 829 (Utter and Brachtenbach, JJ., dissenting on other grounds). The rule construing article 1, section 9 as being identical in scope to the Fifth Amendment has been applied in other circumstances as well. *See, e.g., State v. Mecca Twin Theater & Film Exch., Inc.,* 82 Wn.2d 87, 91, 507 P.2d 1165 (1973); *State v. Foster,* 91 Wn.2d 466, 473, 589 P.2d 789 (1979); *Dutil v. State,* 93

Wn.2d 84, 86–87, 606 P.2d 269 (1980); *State v. Wheeler,* 108 Wn.2d 230, 240, 737 P.2d 1005 (1987).[8]

Now, we are again urged to hold that article 1, section 9 extends broader protection than does the Fifth Amendment. However, the slight difference in wording between the provisions has been held to be nondeterminative, even in a context where the words "evidence" and "witness" commonly express the precise distinction involved. *Moore,* at 56–57. If, as *Moore* held, there is no compelling justification to extend the protections of article 1, section 9 to include physical evidence in the form of chemical tests based on the different wording, then a fortiori, there is no justification for extending broader protection where only testimonial evidence (Earls' voluntary statement) has been admitted.

■■ Because the right to counsel under the state and federal provisions is the same, we proceed with our analysis under federal law, beginning with a general overview of the law as it pertains to the waiver of the constitutional right against self–incrimination. The United States Supreme Court has determined that the Fifth and Fourteenth Amendments' prohibition against compelled self–incrimination requires that custodial interrogation be preceded by advice to the accused that he has the right to remain silent and the right to the presence of an attorney. *Miranda v. Arizona,* 384 U.S. 436, 479, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966). However, the person being interrogated may validly waive the right to counsel. *Miranda,* at 475. If the interrogation takes place without an attorney present, the State has the heavy burden of establishing the

---

[8]We note that in *State v. Wethered,* 110 Wn.2d 466, 755 P.2d 797 (1988), the majority declined to decide if article 1, section 9 provides broader protection than the Fifth Amendment because the appellants failed to engage in a proper analysis of the *Gunwall* criteria. *Wethered,* at 472. Although the majority discussed and reaffirmed *Franco* in connection with a related issue, *Wethered,* at 470–71, inexplicably, no mention was made of *Franco's* holding that *Moore* is stare decisis on the issue.

defendant's waiver of his privilege against self-incrimination and his right to retained or appointed counsel. *Miranda,* at 475. This burden is met if the State can prove the voluntariness of the statement by a preponderance of the evidence. *Lego v. Twomey,* 404 U.S. 477, 486–87, 30 L. Ed. 2d 618, 92 S. Ct. 619 (1972). To be valid, the waiver must be a voluntary, knowing, and intelligent relinquishment of a known right. *Edwards v. Arizona,* 451 U.S. 477, 482, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981). The determination of whether or not a valid waiver was made depends "'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Edwards,* at 482 (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 82 L. Ed. 1461, 58 S. Ct. 1019, 146 A.L.R. 357 (1938)). In this case, we must determine what effect, if any, the failure of the police to tell Earls that Leen had called the station has on the validity of the waiver.

In *Moran v. Burbine,* 475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135 (1986), the Court held that the failure of the police to inform a defendant of the efforts of an attorney, retained without the defendant's knowledge, to contact the defendant does not deprive a defendant of his right to counsel under the Fifth Amendment nor vitiate a waiver of his *Miranda* rights. *Moran v. Burbine, supra.* Earls correctly concedes the validity of his waiver under *Burbine.*

In *Burbine,* the defendant confessed to the murder of a young woman after he had been informed of his *Miranda* rights and had executed a series of written waivers. He did not request an attorney during the interrogation. However, while he was in police custody, his sister retained a lawyer to represent him. *Burbine,* at 415. Ms. Munson, an attorney with the public defender's office, called the detectives' office and explained that Burbine was represented by counsel. She explained that the attorney who would actually represent Burbine was not available, but that she would act as Burbine's legal counsel in the event that the police intended to place him in a lineup or question him. Burbine

was unaware of his sister's efforts to retain counsel and of the fact and contents of Ms. Munson's telephone conversation. *Burbine,* at 417. While Ms. Munson was assured that Burbine would not be questioned further until the next day, in fact, the interrogation session that yielded the inculpatory statements began later that evening. *Burbine,* at 415.

In holding that Burbine's ignorance of the attorney's efforts to reach him did not taint the validity of his waivers, the Court noted that the voluntariness of Burbine's statements was not at issue, nor was there any question about Burbine's comprehension of his rights. *Burbine,* at 421. The Court stated that "[e]vents occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Burbine,* at 422. Furthermore, a waiver is valid as a matter of law once it is determined that a suspect was aware of his rights and the State's intention to use his statements against him, and his decision not to invoke those rights was uncoerced. *Burbine,* at 422–23. The "failure to inform [Burbine] of the telephone call [was not] the kind of 'trick[ery]' that can vitiate the validity of a waiver." *Burbine,* at 423 (quoting *Miranda,* 384 U.S. at 476).

We do note that there are two distinctions between *Burbine* and the present case. First, the attorney in *Burbine* had been retained and she expressly told the detectives that Burbine was represented by counsel and requested that they not interrogate him further without an attorney present. Second, Burbine was unaware of the efforts made on his behalf. We do not believe these distinctions require a different result. Earls was aware of his rights and the State's intention to use his statements against him. Furthermore, his decision not to invoke those rights was not induced by threat or promise. Thus, his waiver was valid as a matter of law. *Burbine,* at 422–23.

Accordingly, we affirm the trial court's refusal to suppress Earls' statements. Michael Earls was repeatedly and

clearly told of his right to have the assistance of an attorney. He freely, knowingly, and intelligently chose to give up that right and to confess to murder in exchange for a reduced charge. We will not suppress that confession because an unretained attorney telephoned the police station during the negotiations with the police and asked to leave a message.

DORE, C.J., BRACHTENBACH, DOLLIVER, ANDERSEN, SMITH, and GUY, JJ., and CALLOW, J. Pro Tem., concur.

UTTER, J. (dissenting)—I dissent. The majority at page 380 notes two distinctions between the United States Supreme Court decision of *Moran v. Burbine*, 475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135 (1986), and the present case, which it believes make no difference. I agree on the first and disagree on the second. The first was that counsel was retained and told detectives Burbine was represented and asked that they not interrogate him further without an attorney present. I agree the fact that the attorney was retained is not significant.

The second factor is significant and the heart of the case. That factor is that Burbine was unaware of the effort to obtain an attorney. This is what distinguishes this case from *Burbine,* and under federal, as well as state law, compels a reversal. Earls invoked his right to counsel by calling his ex–wife and asking her to get him an attorney. After Earls made this request of his ex–wife, he was not made aware of the efforts by the attorney to contact him prior to his confession. For these reasons his waivers were not knowing, intelligent, and voluntary. Following *Burbine,* four states have held such conduct unconstitutional under their constitutions.[9] In addition, the recent case of *Minnick v. Mississippi,* ___ U.S. ___, 112 L. Ed. 2d 489, 111 S. Ct. 486 (1990) reaffirms the commitment of the United States

---

[9]See pages 387–89 of this dissent for a discussion of these cases.

Supreme Court to the importance of counsel. That decision noted:

> Our emphasis on counsel's *presence* at interrogation is not unique to *Edwards.* It derives from *Miranda,* where we said that in the cases before us "[t]he presence of counsel . . . would be the adequate protective device necessary to make the process of police interrogation conform to the dictates of the [Fifth Amendment] privilege. His presence would insure that statements made in the government–established atmosphere are not the product of compulsion."

*Minnick,* 111 S. Ct. at 490.

While *Minnick* did not deal with the same fact situation present in this case and in *Moran,* it did reaffirm the United States Supreme Court's adherence to earlier cases extending the *Miranda* rule and reaffirmed in a 6–judge majority the vitality of the *Miranda* doctrine. Proper application of the *Gunwall* factors compels a similar result. *State v. Gunwall,* 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986). Accordingly, I would find that Earls' constitutional rights were violated under both the federal and the state constitutions.

I

The relevant constitutional provision is the right to counsel under Const. art. 1, § 9, which states in pertinent part:

> No person shall be compelled in any criminal case to give evidence against himself . . . ..

A parallel right is contained in the fifth amendment to the United States Constitution.

A defendant's right to counsel under the Fifth Amendment and article 1, section 9 is not a constitutional right in itself, but is a procedural safeguard against abridgement of the defendant's constitutional right against self–incrimination. *New York v. Quarles,* 467 U.S. 649, 654, 81 L. Ed. 2d 550, 104 S. Ct. 2626 (1984). Thus, it must be affirmatively invoked by the defendant. "If the individual indicates in any manner, at any time prior to or during questioning, that he . . . wants an attorney, the interrogation must cease . . .". *Miranda v. Arizona,* 384 U.S. 436, 473–74, 16

L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966). A waiver of this right, once the right has been asserted, is valid only if the police scrupulously honored the defendant's request, further interrogation was initiated by the defendant, and the waiver was knowing and voluntary. *Edwards v. Arizona,* 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981); *State v. Robtoy,* 98 Wn.2d 30, 653 P.2d 284 (1982). Courts indulge every reasonable presumption against waiver of constitutional rights. *Brewer v. Williams,* 430 U.S. 387, 404, 51 L. Ed. 2d 424, 97 S. Ct. 1232 (1977) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 82 L. Ed. 1461, 58 S. Ct. 1019, 146 A.L.R. 357 (1938)).

Earls made a telephone call to his ex–wife to arrange for an attorney. A police officer dialed the phone and was present during the call. Earls testified he told the booking officer that he wanted to make the call to arrange for an attorney. This testimony is uncontroverted. The booking officer has no independent recollection or written record of the content of the call, although an outgoing call was logged. Earls' ex–wife testified that Earls called her and asked her to obtain an attorney for him.

The question is whether that is sufficient to invoke the right to counsel. *Miranda* says the suspect can indicate in any manner his desire for counsel and after that the police cannot initiate interrogation outside the presence of counsel. However, the interrogating officer had no knowledge of Earls' call to arrange for an attorney. The booking officer, however, did have knowledge of the call. Earls specifically told his ex–wife he needed an attorney. Although the booking officer did not relay this information to anyone else, his knowledge of the call is imputed to all officers involved. *State v. Middleton,* 135 Wis. 2d 297, 312, 399 N.W.2d 917 (1986) (one officer's knowledge of a fact is generally imputed to entire police force whether or not he failed to pass it on). Thus, Earls' phone call to his ex–wife adequately invoked his right to counsel.

Consequently, Earls' waiver was rendered invalid in two ways. Under *Miranda* and *Edwards,* Earls' waiver was not

valid because he invoked his right to counsel, yet the police interrogated him anyway. Under *Burbine,* Earls' waiver was not valid because he was deprived of information necessary to make his waiver knowing, intelligent, and voluntary.

When Earls requested counsel by telephoning his ex–wife and asking her to contact an attorney for him, at that point no interrogation could lawfully take place unless Earls himself initiated the conversation.

Earls' waiver is not valid because the police did not honor his request for counsel and refrain from interrogation until counsel was present. Once an accused has invoked his right to counsel, "a valid waiver of that right cannot be established by showing only that he responded to further police–initiated custodial interrogation even if he has been advised of his rights." *Edwards,* 451 U.S. at 484. The police initiated the interrogation, not Earls. Therefore, his waiver was not valid.

In *Burbine,* the defendant's sister contacted the attorney without the knowledge of the defendant. At no point did Burbine request an attorney. In this case, Earls requested an attorney by calling his ex–wife and asking her to get him one. The attorney was not contacted without Earls' knowledge.

The fact that the contact by the attorney was unilateral and without the defendant's knowledge was crucial to the decision in *Burbine.* The Court noted that the crucial distinguishing feature of that case is that Burbine never requested counsel. 475 U.S. at 423 n.1. That fact removed the situation from that contemplated by *Edwards v. Arizona, supra,* which held that a waiver occurring after invocation of the right to counsel is valid only if the suspect initiated conversation.

*Moran v. Burbine, supra,* is a narrow holding and must be viewed in light of its facts. The issue was whether Burbine's ignorance of the attorney's efforts to reach him tainted his waivers. 475 U.S. at 416. The entire decision is grounded upon the fact that Burbine did not request an attorney and was unaware of his sister's efforts to provide

him with counsel. Because Burbine was totally ignorant of the actions of his sister and the attorney, the knowing and intelligent aspects of his waiver were not affected. Earls, however, did initiate efforts to retain counsel and thus was not ignorant of his ex–wife's efforts on his behalf. His knowledge that his ex–wife intended to contact an attorney for him made his waiver less than knowing and intelligent because when the police failed to inform him of the call from the attorney, he did not have complete information to make that waiver. Accordingly, even under *Burbine,* the waiver was tainted.

While the attorney contacted by Earls' ex–wife was never retained, this is not relevant to the issue of the validity of waiver. The attorney was never given the chance to be retained because Earls did not speak with him. The right to counsel should not hinge on the fortuity of retention of counsel prior to arrest. *See State v. Stoddard,* 206 Conn. 157, 537 A.2d 446, 455 (1988) (unwise to impose upon the police the responsibility of ascertaining the nature of the putative relationship between counsel and suspect).

Moreover, that the attorney was not retained is offset by the fact Earls initiated contact with an attorney by calling his ex–wife and asking her to find him one. The attorney called to offer advice at the request of Earls' ex–wife.

Neither is it relevant that the attorney did not object to interrogation. An accused's constitutional rights cannot be made dependent upon an attorney speaking some "magic words". The attorney's request to speak with Earls was sufficient to halt the proceedings until Earls had consulted with counsel.

Wisconsin distinguished *Burbine* on facts almost identical to this case. In *State v. Middleton,* 135 Wis. 2d 297, 399 N.W.2d 917 (1986), the defendant phoned his wife after his arrest and asked her to contact a specific attorney. The attorney's attempt to see the defendant was rebuffed and the defendant not informed his attorney was there. The defendant waived his rights and made a statement. The

court found *Burbine* inapplicable because of factual differences. Unlike Burbine, Middleton called his wife prior to interrogation and asked her to contact the attorney. Unlike Burbine, Middleton's attorney did not unilaterally seek to contact him. Middleton initiated the events which led to the attempted contact by the attorney. Unlike the situation in *Burbine,* an officer overheard Middleton's call to his wife. In *Middleton,* the police failed to inform the defendant that the specific attorney he had directed his wife to contact had arrived. 135 Wis. 2d at 313. In *Burbine,* the police failed to inform the defendant that an attorney that the defendant did not request had arrived. Therefore, *Burbine* did not control a situation where the defendant had made an attempt to contact the attorney first, and the court found a violation of the defendant's Fifth and Fourteenth Amendment rights. As a result, the court found it unnecessary to decide whether the defendant's state constitutional rights had been violated. *Middleton,* 135 Wis. 2d at 314.

Like Middleton, Earls took the initial step in obtaining an attorney. Thus, when the attorney called to speak with Earls, it was an attorney requested by Earls, not an unknown attorney unilaterally attempting contact. Earls' phone call to his ex-wife made the attorney's phone call to the police station relevant to the waiver. Earls' waiver could not be knowingly and intelligently made when he did not know that an attorney, as a result of Earls' phone call to his ex-wife, had called to offer assistance. He lacked sufficient information to waive his rights. The knowing quality of the waiver disappeared when the facts of the interrogation changed without Earls' knowledge. *See Middleton,* 135 Wis. 2d at 313. When the police failed to tell Earls that the attorney had called, they induced Earls to believe that a state of facts continued to exist when that was no longer true. *See Middleton,* 135 Wis. 2d at 314.

In *State v. Haynes,* 288 Or. 59, 602 P.2d 272 (1979), *cert. denied,* 446 U.S. 945, 64 L. Ed. 2d 802, 100 S. Ct. 2175 (1980), the defendant's wife contacted an attorney after the

defendant was taken into custody. The attorney telephoned the police station, told them he represented the defendant, and was told that he was not there. The attorney discovered that the defendant was in fact there and he called and told the police he was coming to see the defendant. The police removed the defendant from the police station so he was not there when his attorney arrived. The police did not inform him that an attorney had called for him or that the attorney was coming to see him. The defendant waived his rights and made incriminating statements that were admitted at trial. The court held that "when unknown to the person in this situation an identified attorney is actually available and seeking an opportunity to consult with him, and the police do not inform him of that fact, any statement or the fruits of any statement obtained after the police themselves know of the attorney's efforts to reach the arrested person cannot be rendered admissible on the theory that the person knowingly and intelligently waived counsel." *Haynes,* 288 Or. at 70.

> To pass up an abstract offer to call some unknown lawyer is very different from refusing to talk with an identified attorney actually available to provide at least initial assistance and advice, whatever might be arranged in the long run. A suspect indifferent to the first offer may well react quite differently to the second. . . .

*Haynes,* at 72.

Oregon adheres to *State v. Haynes, supra,* notwithstanding *Moran v. Burbine, supra. See State v. Isom,* 306 Or. 587, 761 P.2d 524 (1988).

Since the decision in *Burbine,* four states have found the failure of police to inform a suspect of an attorney's attempts to contact the suspect vitiated a waiver of constitutional rights, and, thus, violated the state constitution.

In Florida, the State Supreme Court found that the police conduct in not informing the defendant of his attorney's efforts at contact and denial to the attorney of access to the defendant violated the state constitution's due process provision. *Haliburton v. State,* 514 So. 2d 1088, 1090 (Fla. 1987). This holding was reaffirmed in *State v. Allen,*

548 So. 2d 762 (Fla. Dist. Ct. App. 1989) (*Moran v. Burbine, supra,* unpersuasive because concern is with police interference with attorney–client relationship to extent due process guaranteed by state constitution denied).

Connecticut also relied on its state constitution when confronted with this situation. *State v. Stoddard,* 206 Conn. 157, 537 A.2d 446 (1988). The relevant Connecticut constitutional provision states, "No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law . . .". Conn. Const. art. 1, § 8. Significantly, the self–incrimination language is identical to Washington's. The court discussed the history of the right to counsel in Connecticut and noted that the United States Supreme Court has looked to Connecticut in expanding this right. *Stoddard,* 537 A.2d at 451. This history not only illuminates the right to counsel but also informs the due process concerns raised by police interference with counsel's access to a suspect. *Stoddard,* 537 A.2d at 452. Thus, the decision is based on the right to counsel and due process.

When the defendant in *Stoddard* was arrested, his girl friend contacted an attorney who had represented him on prior charges. A partner of the defendant's attorney attempted to reach the defendant by telephone four times. The attorney requested each time to speak with the defendant. Three times the attorney was told that the defendant was not at the police station when in fact he was. The defendant did not know of the attorney's repeated attempts to contact him, and during interrogation made incriminating statements. The court stated:

> [W]e conclude that a suspect must be informed promptly of timely efforts by counsel to render pertinent legal assistance. Armed with that information, the suspect must be permitted to choose whether he wishes to speak with counsel, in which event interrogation must cease, or whether he will forego assistance of counsel, in which event counsel need not be afforded access to the suspect. The police may not preclude the suspect from exercising the choice to which he is constitutionally entitled by responding in less than forthright fashion to the efforts by counsel to contact the suspect. *The police, because they are*

*responsible for the suspect's isolation, have a duty to act reasonably, diligently and promptly to provide counsel with accurate information and to apprise the suspect of the efforts by counsel.*

(Italics mine.) *Stoddard,* at 166–67.

In *Roeder v. State,* 768 S.W.2d 745 (Tex. Ct. App. 1988), the defendant argued for adherence to pre–*Burbine* law based on the Texas constitution. The court found that *Dunn v. State,* 696 S.W.2d 561 (Tex. Crim. App. 1985), a pre–*Burbine* case, was based on the state as well as the federal constitution so it declined to follow *Burbine.* 768 S.W.2d at 754. Since the suspect was not told that an attorney was attempting to see him, his waiver of counsel was not knowing, intelligent, and voluntary. 768 S.W.2d at 755.

In *Bryan v. State,* 571 A.2d 170 (Del. 1990), the court reaffirmed and clarified its pre–*Burbine* ruling in *Weber v. State,* 457 A.2d 674 (Del. 1983). The court declared that the Delaware constitution requires the police to inform a custodial suspect of his counsel's attempt to render assistance. The court conditioned this rule on the attorney's making a reasonable, diligent, and timely attempt to contact her client and having been specifically retained or appointed to represent the accused. 571 A.2d at 175. The court reasoned that a purported waiver can never be knowing, intelligent, and voluntary when police do not inform a suspect that his attorney seeks to give him legal advice. 571 A.2d at 176.

The failure of police to inform Earls before he waived his rights that the attorney had called violated the Fifth Amendment. Earls' federal constitutional rights were violated. Thus, Earls' state constitutional rights were violated because the State must provide at least as much protection as the federal constitution does.

## II

Even if *Burbine* did require affirmance under the Fifth Amendment, the state constitution should be interpreted

more broadly than the federal constitution to be more protective of individual rights. *State v. Gunwall,* 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986) outlined six non-exclusive neutral criteria to guide the court in determining whether the state constitution should be considered as extending broader rights to individuals than the United States Constitution. The six factors are intended to provide a process for interpreting the state constitution that is articulable, reasonable, and reasoned. *Gunwall,* 106 Wn.2d at 63. Thus, the court requires parties who urge an independent state analysis to consider these principles. *State v. Carver,* 113 Wn.2d 591, 598–99, 781 P.2d 1308, 789 P.2d 306 (1989); *State v. Wethered,* 110 Wn.2d 466, 472, 755 P.2d 797 (1988). Earls has presented the *Gunwall* factors as the basis for his argument that the state constitution should be interpreted as more protective of his rights than the federal interpretation of *Moran v. Burbine, supra.* Thus, the court has been given the proper tools for a separate and independent state analysis.

The first two criteria are closely related so treated together.

(1) *The textual language of the state constitution;* and (2) *significant differences in the texts of parallel provisions of the federal and state constitutions.*

Although parallel rights are contained in the state and federal provisions at issue, the language of article 1, section 9 differs from the language of the Fifth Amendment. Whereas under the Fifth Amendment a person cannot be compelled to be a *witness* against himself, under the state constitution a person cannot be compelled to *give evidence* against himself. On its face, the language of article 1, section 9 is broader. While the terms may be legally consonant, the fact remains the drafters chose different language. The drafters of the Washington provisions may reasonably be assumed to be aware of these linguistic differences and their effect on future interpretation, and therefore, they intended the differences. *See* Utter, *Freedom and Diversity in a Federal System: Perspectives on State Constitutions*

*and the Washington Declaration of Rights,* 7 U. Puget Sound L. Rev. 491, 515 (1984).

Furthermore, the proposed language of article 1, section 9 was that a person cannot be compelled to testify against himself. *Journal of the Washington Constitutional Convention, 1889,* at 498 (B. Rosenow ed. 1962). This was not adopted. Instead, the convention chose the "give evidence against himself" language. The proposed language is closer in meaning to the federal "be a witness" language than the final wording, but it was discarded. This also suggests the drafters intended something different from the federal right.

The majority recognizes the difference in the proposed and adopted language, but states that this is insufficient to support an independent interpretation of the state constitution. Yet, in *Gunwall,* the fact that the proposed language of article 1, section 7 was identical to the Fourth Amendment while the adopted language was different was found to support an independent reading of the state constitution. *Gunwall,* 106 Wn.2d at 66.

The difference in language suggests the drafters meant something different from the federal Bill of Rights. This suggestion is strengthened by the fact that the other rights contained in the Fifth Amendment are substantially different from the other rights of article 1, section 9. The Fifth Amendment also contains indictment by grand jury for capital crimes, double jeopardy, due process and takings. Article 1, section 9 contains only self–incrimination and double jeopardy. The provision as a whole differs greatly from the federal one in language and the rights contained therein. This supports the contention that the state provision was not modeled on the federal one and was meant to be interpreted independently.

(3) *State constitutional and common law history.*

Washington's Declaration of Rights in article 1 of the constitution had its sources primarily in other states' constitutions, rather than the federal charter. Utter, 7 U. Puget Sound L. Rev. at 497. Most notably, Washington borrowed

heavily from Oregon and Indiana. Utter & Pitler, *Presenting a State Constitutional Argument: Comment on Theory and Technique,* 20 Ind. L. Rev. 635, 635 (1987). Both Washington and Oregon modeled their Bills of Rights on the Indiana Constitution of 1851. Utter & Pitler, 20 Ind. L. Rev. at 635. *See also Journal of the Washington State Constitutional Convention, 1889,* at 498 n.16, 511 n.37 (B. Rosenow ed. 1962). Indiana's original charter was derived from revolutionary era state constitutions. Utter & Pitler, 20 Ind. L. Rev. at 635.

Many of the fundamental rights contained in these charters have their origins in common law predating the American Revolution. Note, *Federalism, Uniformity, and the State Constitution—State v. Gunwall, 106 Wn.2d 54, 720 P.2d 808 (1986),* 62 Wash. L. Rev. 569, 569 (1987).

The fact that Washington based its Declaration of Rights on the Bills of Rights of other states that, in turn, did not rely on the federal constitution, but on common law, supports an independent reading of the state constitution.

(4) *Preexisting state law.*

The majority intimates that the only relevant state law considered under this factor is case law dealing specifically with article 1, section 9. This is not true. *Gunwall* refers to statutory law and case law dealing with the issue involved, not only those cases which interpret the particular constitutional provision. While this court has traditionally interpreted article 1, section 9 to be coextensive with the Fifth Amendment, we did so under different fact scenarios and concerning different issues. The cases cited by the majority did not deal with the right to counsel issue presented here. *State v. Moore,* 79 Wn.2d 51, 483 P.2d 630 (1971), involved the constitutionality of the "implied consent law" relating to breath tests of drivers suspected of intoxication. Because the United States Supreme Court excluded physical evidence from the privilege against self–incrimination, so did this court.

In *State v. Moore, supra,* the Washington court adopted the Supreme Court's "testimonial" interpretation of the

privilege against self–incrimination and relied exclusively on the intentions of the framers of the federal provision. The *Moore* court did not realize that the purposeful departure from the federal text reflected the influence of a trespassory theory of privacy rights and the convergence theory of exclusion articulated in *Boyd v. United States*, 116 U.S. 616, 29 L. Ed. 746, 6 S. Ct. 524 (1886). *Boyd* was decided 3 years before the drafting of the state constitution. It is argued in Comment, *The Origin and Development of Washington's Independent Exclusionary Rule: Constitutional Right and Constitutionally Compelled Remedy*, 61 Wash. L. Rev. 459, 522 (1986), that

> the "give evidence" language in article 1, section 9 probably reflected the framers' intent to incorporate the *Boyd* convergence theory. Like article 1, section 7, the text of the self–incrimination guarantee seems to have come directly from *Boyd*. In *Boyd*, Justice Bradley carefully examined the fourth and fifth amendments and concluded that searches and seizures conducted in violation of the fourth amendment, were "almost always made for the purpose of *compelling a man to give evidence against himself*, which in criminal cases is condemned under the Fifth Amendment."
>
> Under the convergence theory adopted by the framers, article 1, section 9 mandates the exclusion of physical and real evidence obtained in violation of the defendant's constitutionally guaranteed right to privacy.

(Footnote omitted.)

*State v. Mecca Twin Theater & Film Exch., Inc.*, 82 Wn.2d 87, 507 P.2d 1165 (1973) involved a corporation attempting to claim the privilege against self–incrimination in order to avoid a show cause order and an order to preserve and deliver a film. The issue in *State v. Foster*, 91 Wn.2d 466, 589 P.2d 789 (1979) was whether the defendant was "compelled" to testify because he did not have notice that the jury would be instructed on a lesser degree of assault. Since both the state and federal provisions use the word compelled, they were interpreted identically.

In *State v. Wheeler*, 108 Wn.2d 230, 737 P.2d 1005 (1987), the question of article 1, section 9 and the Fifth Amendment arose in the context of a jury instruction

regarding the defendant's failure to testify. *Dutil v. State,* 93 Wn.2d 84, 606 P.2d 269 (1980) comes the closest to the right to counsel issue. In that case, juvenile petitioners asserted an unwaivable constitutional right to a sympathetic adult to advise them on the question of waiver. The court adhered to the federal "totality of the circumstances" test for protection of a juvenile's Fifth and Sixth Amendment rights. This is still not the same issue involved in the case at bench.

While the Court of Appeals cases cited by petitioner do not specifically rely on article 1, section 9, they do involve the same issue, and are more similar to the present case than the cases cited by the majority as preexisting state law. Thus, they are relevant to a *Gunwall* analysis.

Prior to the United States Supreme Court decision in *Moran v. Burbine,* 475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135 (1986), the Court of Appeals held that the failure to notify the defendant of his counsel's availability and objection to interrogation prior to his being interrogated denied the defendant the assistance of counsel and vitiated his waiver of the right to counsel. *State v. Jones,* 19 Wn. App. 850, 578 P.2d 71 (1978). Jones signed a written waiver of his rights at the time of his arrest. While Jones was in custody, his mother retained an attorney who called the police and expressly requested that police not interrogate Jones in his absence. *Jones,* at 851. The police did not inform Jones of the attorney's call and request that he not be interrogated. During questioning, Jones made an incriminating statement that was admitted at trial. *Jones,* at 851–52. The court found that this denied Jones effective assistance of counsel and that his waiver was not knowingly and intelligently made. The fact that an attorney has been retained and objects to interrogation must be communicated to the defendant in order for a defendant to knowingly and intelligently waive his rights. Thus, the statement should not have been admitted at trial.

The *Jones* court based its decision on cases from Louisiana, Pennsylvania and Massachusetts, as well as United

States Supreme Court cases, and never explicitly relied on either a federal or state constitutional provision.

Several months after the *Burbine* decision, the Court of Appeals decided *State v. Murphy,* 44 Wn. App. 290, 721 P.2d 30, *review denied,* 107 Wn.2d 1002 (1986). The issue was whether the court should adopt the New York rule that once an attorney is retained or appointed, the police may not question the suspect in the absence of counsel, and any waiver of the right to counsel must be executed in the presence of the attorney. *Murphy,* 44 Wn. App. at 292–93. *See People v. Arthur,* 22 N.Y.2d 325, 239 N.E.2d 537, 292 N.Y.S.2d 663 (1968); *People v. Hobson,* 39 N.Y.2d 479, 348 N.E.2d 894, 384 N.Y.S.2d 419 (1976). The court determined that the rule urged by appellant was not required by the fifth or sixth amendments to the United States Constitution, or Const. art. 1, § 22 (amend. 10). *Murphy,* at 293. The court recognized *Moran v. Burbine, supra,* but adopted the reasoning of an Oregon case which is contrary to *Burbine.* In *State v. Haynes,* 288 Or. 59, 602 P.2d 272 (1979), *cert. denied,* 446 U.S. 945, 64 L. Ed. 2d 802, 100 S. Ct. 2175 (1980), the court held that when police do not allow counsel to see a person in custody or do not inform the person of the attorney's efforts to contact him, the State cannot rely on the defendant's waiver to admit statements made by the defendant. The *Murphy* court found *Jones* distinguishable because Murphy was informed of counsel's efforts and, consequently, was able to make a knowing and intelligent waiver.

*Jones* was cited in *Burbine* as a case contrary to the Supreme Court's holding. *Murphy* is important because it expressly refused to follow *Burbine.* Thus, the existence of Washington law on this issue that both predates and antedates the United States Supreme Court decision supports an independent interpretation of article 1, section 9.

(5) *Differences in structure between the federal and state constitutions.*

*Gunwall* recognized that the structure of the federal and state constitutions differs in that the federal constitution

grants power to the federal government while state constitutions put limits on the power of the state government. 106 Wn.2d at 62. Thus, the court found that the affirmation of fundamental rights in the state constitution may be seen as a guaranty of those rights rather than a restriction on them. *Gunwall,* at 62. Thus, the structure favors a separate interpretation of the fundamental rights guaranteed by the state constitution.

State constitutions were originally intended to be the primary devices to protect individual rights, with the United States Constitution a secondary layer of protection. Utter, 7 U. Puget Sound L. Rev. at 497; Utter & Pitler, 20 Ind. L. Rev. at 636. Accordingly, state constitutions were intended to give broader protection than the federal constitution. An independent interpretation is necessary to fulfill this intention.

*Gunwall* indicates that this factor will always support an independent interpretation of the state constitution because the difference in structure is a constant. 106 Wn.2d at 62, 66. The fifth criterion is a general statement of an immutable fact. The majority refuses to consider this factor because the defendant correctly perceives that the fifth factor is a simple proposition that the overall structure and purpose of the state and federal constitutions differ, therefore, it is logical to analyze them separately. Under *Gunwall,* this fifth criterion supports an independent reading of the state constitution in any situation. The majority misunderstands the fifth *Gunwall* factor.

(6) *Matters of particular state interest or local concern.*

As the majority in *Moran v. Burbine, supra,* recognized, criminal law is a uniquely local matter. The Court stated that nothing in the constitution gave the Court the authority to mandate a code of behavior for state officials wholly unconnected to any federal right or privilege. 475 U.S. at 425. Thus, the Court felt that the case did not warrant a federal intrusion into the criminal processes of the states. 475 U.S. at 434. For this reason, it invited states to adopt different requirements for the conduct of state officials as a

matter of state law. 475 U.S. at 428. There is no need for national uniformity in criminal law. Principles of federalism and state sovereignty make criminal law local in character.

Contrary to the conclusion of the majority, the *Gunwall* factors do support an independent and separate interpretation of article 1, section 9 of the Washington Constitution.

Although the police conduct in this case is not as egregious as the misconduct of *Burbine,* the conduct of police is irrelevant to the issue of waiver. 475 U.S. at 423; *Stoddard,* at 170 (the focus must be on the rights of the accused, not the innocence or culpability of the police). Police misconduct figures only for due process concerns. *Burbine,* 475 U.S. at 432–34. Thus, that the failure of the police to inform Earls of the phone call seems more unintentional than deceptive is irrelevant. "[I]t is for the police, as an entity, to establish and maintain adequate procedures that will facilitate the reasonably prompt communication between an attorney and a suspect." *Stoddard,* at 172. Also irrelevant is the fact that the interrogating officer did not know of the phone call from the attorney. The knowledge of the officer who took the message for Earls to call the attorney should be imputed to the interrogating officer. *See Stoddard,* at 171.

The court should interpret the state constitution more broadly than the United States Supreme Court interpretation of the federal constitution on this issue. The decision in *Moran v. Burbine, supra,* has been sharply criticized as sanctioning police misconduct. *See* Note, *Moran v. Burbine: Constitutional Rights of Custodial Suspects,* 34 Wayne L. Rev. 331, 356 (1987) (Court adopted vague due process standard that only requires police to act in a manner that does not shock society's sensibilities); Note, *Moran v. Burbine: The Decline of Defense Counsel's "Vital" Role in the Criminal Justice System,* 36 Cath. U.L. Rev. 253, 254 (1986) (decision has seriously threatened defense counsels' ability to provide clients with meaningful assistance prior to and during custodial interrogation); Note, *The*

*Supreme Court—Leading Cases,* 100 Harv. L. Rev. 100, 126 (1986) (*Moran v. Burbine, supra,* betrays the spirit of *Miranda* by placing judicial seal of approval on official deception); Note, *Moran v. Burbine: Supreme Court Tolerates Police Interference With the Attorney–Client Relationship,* 18 Loy. U. Chi. L.J. 251, 252 (1986) (decision has sanctioned police interference with efforts by attorneys to represent suspects during custodial interrogations).

To combat the effects of *Burbine,* the commentators recommend states rely on their own constitutions to protect the right of criminal suspects to have the advice of counsel. *See* Note, 18 Loy. U. Chi. L.J. at 275–83; Note, 36 Cath. U.L. Rev. at 285.

I would reverse Earls' conviction because his waiver of his constitutional rights was not voluntarily, knowingly, and intelligently made.