# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 46533-7-II |
| Respondent, | |
| v. | |
| WILLIAM CHARLES HORTON, JR. | PART PUBLISHED OPINION |
| Appellant. | |

MELNICK, J. — William Charles Horton Jr. appeals his conviction for unlawful possession of a firearm in the first degree and murder in the first degree. In the published portion of this opinion, we conclude that article I, section 9 of the Washington Constitution does not afford greater protections than the United States Constitution regarding waiver of counsel and thus, the trial court did not err by admitting Horton's statements. Additionally, we conclude that a Florida "withheld adjudication" properly served as the predicate offense for Horton's unlawful possession of a firearm conviction.

In the unpublished portion of this opinion, we conclude that the trial court did not abuse its discretion by excluding evidence of the victim's gang affiliation or by declining to instruct the jury on manslaughter. We also conclude that Horton cannot establish his prosecutorial misconduct claim, and as a result, his ineffective assistance of counsel claim also fails. Finally, we conclude that Horton's cumulative error claim is unsupported because he received a fair trial.

We affirm the trial court.

FACTS[1]

I.  THE CRIME

In the early morning of October 24, 2012, police responded to a dispatch call.  Dispatch reported that shots were fired and that a witness saw a black male dragging another black male toward the street.  When Sergeant Matt Brown and Officers Ryan Moody, Timothy Borchardt, and Noah Dier arrived, they observed what they later discovered to be the dead body of Charles Pitts in the middle of the parking lot.

Before the officers could approach the body, a man, later identified as Horton, ran into the parking lot carrying a gun and yelling.  Horton yelled, "I'm going to kill you, m*****f***er" and stood over the body.  4 Report of Proceedings (RP) at 209.  The police announced their presence and ordered Horton to get on the ground.  Horton obeyed, dropped the gun, and got down on the ground next to the body.  The police placed him in handcuffs.  Horton was wearing a Chicago Bears jacket.  Pitts's shirt was partially pulled over his head, and there was a bullet hole below his naval and a bullet hole in his chest.  The police took the gun Horton dropped into evidence and noted the chamber was partially open with a bullet casing lodged inside.[2]

While officers placed Horton in handcuffs, Horton said to an officer, "They're not involved.  I'm the only suspect."  4 RP at 237.  Horton appeared to be referring to people standing outside nearby apartments.  Horton also looked at the deceased, while laughing and stated, "That m*****f***er is dead."  4 RP at 238.

---

[1] In the published portion of this opinion we include only the facts necessary to decide the published issues.  Additional facts are included in the unpublished portion.

[2] According to officers, the weapon malfunctioned and caused this occurrence.  The weapon was a semiautomatic pistol.

Horton was put in Officer Mark Holthaus's patrol car because it had an in-car video camera. Before Holthaus could advise Horton of his *Miranda*[3] rights, Horton stated the guy in the parking lot "was part of the Hilltop Crips and that's what did it." 5 RP at 355. Holthaus then read Horton his *Miranda* rights. Horton acknowledged that he understood his rights, but Holthaus did not question him. According to one officer, before Horton got in Holthaus's car, Horton told officers his leg and back were injured. The video of Horton in the back of the car was later admitted into evidence at Horton's trial and viewed by the jury.

Holthaus transported Horton to the police station where Investigator Sean Conlon took custody of him. At the station, Conlon read Horton his *Miranda* rights a second time and then conducted a video recorded interview after Horton indicated he understood his rights and was willing to waive his rights and talk. Horton admitted to shooting Pitts, but at times throughout the interview he indicated it was in self-defense.

Officers identified the apartment tied to the events of the night and secured it, along with the tenant, Baron Johnson, who was standing nearby or inside the apartment. Officer Moody noted blood on the floor by the entryway. He also smelled a "fairly strong" odor of marijuana. 5 RP at 330. The blood indicated something had been dragged from inside the apartment to the outside. Two spent shell casings were located inside the apartment. Officers also recovered a black bag from the parking lot near where Pitts's body was found and where Horton had been taken into custody. The bag contained marijuana and ten blue tablets, which appeared to be Ecstasy.[4]

In events leading up to the shooting, Horton, Johnson, Gregory Borja, Anthony Ross, and Alonza Williams gathered at Johnson's apartment. After drinking and barbequing at the

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[4] Methylenedioxymethamphetamine.

apartment, the group went to a night club. Johnson and Borja saw Pitts outside of the club. Johnson and Ross also saw Horton with a gun at some point that day.

The group drank and stayed at the club until about 1:30 A.M., when they returned to Johnson's apartment. Horton, Ross, Borja, and Williams rode in a car together. Pitts also showed up at the apartment shortly after the group arrived.

According to Johnson, Horton wanted to "slap box" with Pitts. 5 RP at 397. Borja said that everyone was having a good time, and Horton and Pitts were briefly slap boxing but were playing around. Borja thought that Pitts "got the better hand" of Horton once. 9 RP at 1085. Ross said that Horton and Pitts were in each other's faces and "smack talking." 8 RP at 1006.

Horton and Pitts were intoxicated. Johnson described Horton's level of intoxication at the club earlier as "pretty up there," and confirmed that meant drunk. 5 RP at 492. He had heard that Horton was on Ecstasy but did not see him take it.

According to Horton, he did not slap box with Pitts. Horton said Pitts came into the apartment and began calling him "cuz." 11 RP at 1476, 1479. Pitts asked him about his Chicago Bears jacket, its black and orange colors, and whether he was a "Hoover."[5] 11 RP at 1480. Horton stated that Pitts remarked on the colors of Horton's jacket in "his neighborhood" and asked him, "What you doing with the colors on over here, Cuz; are you from Hoover or something?" 11 RP at 1480. Pitts hit Horton, and Horton stated, "I've never been hit that hard in my life. It was one of those hits that I remember to this day. I ain't never been hit like that." 11 RP at 1484. About a week before Pitts's death, Horton saw Pitts beat up another person to the point where the other

---

[5] Based on testimony at trial, this was a gang name reference. Conlon also testified that California Hoover Crips are sometimes confused for Chicago Gangster Disciples, which are entirely separate.

guy's "face looked like a punkin." 11 RP at 1496. Horton said, "I knew what this man was capable of and I was in fear for my life. I believe that man said he was going to kill me." 11 RP at 1497.

Johnson went into his bedroom. At some point shortly thereafter, Borja got a bad feeling when Horton began talking about being a Black Gangster Disciple (BGD) from Chicago and thought it was time to go. Borja, Ross, and Williams left the apartment.

While Johnson was in his bedroom, Horton shot Pitts in the living room. Johnson did not see the first shot but said he ran into the living room to see smoke coming out of Pitts's abdomen and Horton shooting Pitts again. Johnson believed Horton said, "You can't do nothing to me now. You're dead," before shooting Pitts again three more times. 5 RP at 431. Horton was not wearing shoes or a shirt.

According to Horton, Johnson told him to get Pitts out of the house. Horton told Johnson he would take care of it and began to drag Pitts outside. Horton came back to the apartment to get his shoes and jacket, and when he ran back to Pitts in the parking lot, the police had arrived.

II.  THE FIRST TRIAL

On October 25, 2012, the State charged Horton by information with murder in the first degree with a firearm enhancement and unlawful possession of a firearm in the first degree.[6] The State also charged a gang aggravator for both crimes.[7]

A.  Hearing on Admissibility of Defendant's Statements

On March 18, 2014, prior to the start of trial, the trial court conducted a hearing pursuant to CrR 3.5. The State presented testimony from Sergeant Brown and Officers James Syler, Dier,

---

[6] RCW 9A.32.030(1)(a); RCW 9.41.010; RCW 9.94A.530; RCW 9.94A.533.

[7] RCW 9.94A.535(3)(aa) (aggravated by committing the offense with intent to directly or indirectly cause any benefit, aggrandizement, gain, profit, or other advantage to or for a criminal street gang); RCW 9.94A.030.

Holthaus, and Conlon. The trial court ruled that the statements Horton made during his arrest and while speaking with Conlon were admissible in the State's case in chief. The court entered written findings of fact.

In pertinent part, the trial court found that Horton was advised of his *Miranda* rights, and that Horton understood his rights and waived them. The court also found that after being transported to the police station, the police put Horton in a recorded interview room. They provided notice to Horton about the recording, and again advised him of his *Miranda* rights. Horton stated he understood his rights and was willing to waive them and speak with Conlon. Horton signed the advisement of rights form. The court further found,

> Shortly after being advised of his *Miranda* rights, [Horton] made a comment, "I do have a lawyer." The investigator asked what the defendant meant and he responded, "I don't have a lawyer." The investigator asked "What did you have a lawyer for?" The defendant responded "why would I have a lawyer?" The investigator asked if the defendant was referring to a previous case and the defendant responded, "naw, naw, I didn't have no lawyer for a previous case. But I do have lawyers . . . but I'm just saying, this guy right here man [referencing the victim] . . . fuck shit man." The defendant then proceeded to talk about the events that transpired that night. At no other point did the defendant reference an attorney or otherwise suggest that he was invoking his right to an attorney or his right to remain silent.

Clerk's Papers (CP) at 205.

From its findings, the trial court concluded that Horton's statements on October 24, 2012, were admissible. The court also concluded that Horton's statements made to Conlon after arriving at the station followed two full advisements of his *Miranda* rights and that Horton knowingly, voluntarily, and intelligently waived his rights and spoke with officers. The court further concluded that the comments regarding a lawyer "were not an unequivocal requests for an attorney that invoked the right to counsel." CP at 206. Instead, the comments were

unclear, contradictory, and required clarification. The court reach[ed] this conclusion based on the entire context and totality of [Horton's] actions. This include[ed] but [was] not limited to his repeated eagerness to talk to law enforcement that night, his express statement to Investigator Conlon that he knew he could "shut up" and not talk about what happened, and the fact that he could not be referring to an attorney he had secured on this matter since he did not have an opportunity from the time of the shooting to retain counsel.

CP at 206-07.

B.      Pretrial Motions in Limine

Pretrial, the State provided Horton notice of its intent to use Horton's prior armed robbery conviction in Florida. The State said it would use the Florida robbery conviction as the predicate offense for the unlawful possession of a firearm charge. Horton filed a motion to exclude it.

At the pretrial hearing on this motion, the State argued that the defense was really arguing a *Knapstad*[8] motion, not an ER 609 motion. The trial court stated the issue needed to be adequately briefed. Horton then filed a brief in support of his motion to exclude evidence of the Florida conviction because it was a withheld adjudication.[9] He asked the trial court to conclude that a withheld adjudication was not a prior conviction for the purposes of a predicate offense for unlawful possession of a firearm. The State filed a response and again referred to Horton's motion as a *Knapstad* motion. Defense counsel acknowledged during argument, "I'm essentially, as the State asserted, arguing a *Knapstad* motion as part of a 609 motion because I didn't brief a *Knapstad*." RP (March 18, 2014) at 166.

---

[8] *State v. Knapstad*, 107 Wn.2d 346, 729 P.2d 48 (1986).

[9] FLA. STAT. ANN. § 948.01(2) states, "If it appears to the court upon a hearing of the matter that the defendant is not likely again to engage in a criminal course of conduct and that the ends of justice and the welfare of society do not require that the defendant presently suffer the penalty imposed by law, the court, in its discretion, may either adjudge the defendant to be guilty or stay and withhold the adjudication of guilt. In either case, the court shall stay and withhold the imposition of sentence upon the defendant and shall place a felony defendant upon probation."

The trial court denied Horton's motion to exclude. It found that "a plea of guilty combined with adjudication withheld in the state of Florida would be considered a conviction for purposes of a predicate offense for the unlawful possession of a firearm statute in the state of Washington." RP (March 25, 2014) at 4.

C.     Trial

The case proceeded to trial. Horton stipulated that exhibit 10-B was a certified copy of his withheld adjudication from Florida. At trial, the court admitted Exhibit 10-B. The document established that Horton pled guilty to armed robbery and that the Florida court entered a withheld adjudication.

The trial court instructed the jury as follows: "You have heard evidence that the defendant pled guilty to Armed Robbery and that the court imposed a sentence of 'adjudication withheld.' You may consider this evidence only for the purpose of [unlawful possession of a firearm]. You must not consider this evidence for any other purpose." CP at 303 (Instr. 20). It also instructed the jury, "A person commits the crime of unlawful possession of a firearm in the first degree when he has previously been adjudicated guilty as a juvenile of a serious offense and knowingly owns or has in his possession or control any firearm." CP at 304 (Instr. 21). And, the court instructed the jury that "[a] guilty plea to the charge of armed robbery, in the State of Florida, with a sentence of 'adjudication withheld' as a juvenile, is an adjudication of guilty to a serious offense." CP at 305 (Instr. 22).

The "to convict" instruction for unlawful possession of a firearm stated,

> To convict the defendant of the crime of Unlawful Possession of a Firearm in the First Degree as charged in count II, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about the 24th day of October, 2012, the defendant knowingly owned a firearm or had a firearm in his possession or control;

(2) That the defendant had previously been adjudicated guilty as a juvenile of a serious offense; and

(3) That the ownership, or possession or control of the firearm occurred in the State of Washington.

CP at 309 (Instr. 26).

The jury found Horton guilty of unlawful possession of a firearm in the first degree but did not reach a verdict on the murder charge. The jury also did not return an answer on the special verdict form for the gang aggravator.

III.     THE SECOND TRIAL

The State retried Horton on the murder in the first degree charge and the gang aggravator, and the jury returned a guilty verdict for murder in the first degree, and found that Horton was armed with a firearm. The jury also found that the gang aggravator was proven. The court entered findings of fact and conclusions of law and imposed an exceptional sentence. It sentenced Horton to 481 months of confinement and 36 months of community custody.

Horton appeals.

ANALYSIS

I.     HORTON'S OUT-OF-COURT STATEMENTS

Horton argues the trial court erred by admitting his statements to Conlon at the police station after Horton received his *Miranda* warnings.[10] We disagree.

---

[10] Horton does not contest the admission of his statements to the officers in the parking lot.

A.    Standard of Review

The Fifth Amendment to the United States Constitution protects a defendant against self-incrimination.  Article 1, section 9, of the Washington Constitution states, "No person shall be compelled in any criminal case to give evidence against himself."  "*Miranda* warnings were developed to protect a defendant's constitutional right not to make incriminating confessions or admissions to police while in the coercive environment of police custody." *State v. Heritage*, 152 Wn.2d 210, 214, 95 P.3d 345 (2004).  "Without *Miranda* warnings, a suspect's statements during custodial interrogation are presumed involuntary." *Heritage*, 152 Wn.2d at 214.

The government bears the burden of showing, by a preponderance of the evidence, that the suspect understood his rights and voluntarily waived them. *State v. Radcliffe*, 164 Wn.2d 900, 905-06, 194 P.3d 250 (2008).  Once waived, a suspect may ask for an attorney at any time. *Radcliffe*, 164 Wn.2d at 906.  If he requests an attorney, all questioning must stop until he has an attorney or starts talking again on his own. *Radcliffe*, 164 Wn.2d at 906.  The suspect's request for an attorney must be unequivocal; an equivocal request is insufficient. *Radcliffe*, 164 Wn.2d at 906-07.

We treat unchallenged findings of fact following a CrR 3.5 hearing as verities on appeal. *State v. Lorenz*, 152 Wn.2d 22, 30, 93 P.3d 133 (2004).  We review whether the trial court derived proper conclusions of law from its findings of fact de novo. *State v. Grogan*, 147 Wn. App. 511, 516, 195 P.3d 1017 (2008).

B.    Right to Counsel

Horton argues that under article 1, section 9 of the Washington State Constitution, Conlon should have inquired further into his invocation of the right to counsel after he said the word "lawyer" and that as a result, the trial court erred by admitting his statements.  Horton does not

assign error to the trial court's CrR 3.5 hearing findings of fact. Therefore, we consider the findings of fact as verities. *Lorenz*, 152 Wn.2d at 30.

Here, the trial court found that when Horton stated in the interview room, "I do have a lawyer," "I don't have a lawyer," "[W]hy would I have a lawyer?", and "I do have lawyers," he was neither invoking his right to counsel nor his right to remain silent. CP at 205. The court concluded the "unclear" and "contradictory" statements "were not an unequivocal request for an attorney." CP at 206.

Horton does not argue that under the Fifth Amendment to the United States Constitution, his right to counsel was violated. Instead, Horton contends that article 1, section 9, of the Washington State Constitution affords greater protections than the Fifth Amendment and therefore, the trial court should have applied the standard set forth in *State v. Robtoy*, 98 Wn.2d 30, 39, 653 P.2d 284 (1982) (holding a suspect's equivocal request for an attorney forbids further questioning), rather than that in *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994) (holding only an unequivocal request to speak to an attorney, after waiver of the right, mandates an end to police interrogation). He argues that a *Gunwall*[11] analysis is appropriate and asserts that Washington courts have not answered whether *Robtoy* applies under article 1, section 9, of the Washington State Constitution.

A *Gunwall* analysis is not appropriate in this case. Our Supreme Court recommended that courts analyze six, nonexclusive criteria to determine whether a particular provision of the Washington Constitution affords broader rights to its citizens than the United States Constitution does. *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986). The six criteria are: (1) the textual

---

[11] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986).

language; (2) differences in the texts; (3) constitutional history; (4) preexisting state law; (5) structural differences; and (6) matters of particular state or local concern. *Gunwall*, 106 Wn.2d at 58. "A determination that a given state constitutional provision affords enhanced protection in a particular context does not necessarily mandate such a result in a different context." *State v. Russell*, 125 Wn.2d 24, 58, 882 P.2d 747 (1994). However, our Supreme Court has already determined that the state constitution's article 1, section 9, is co-extensive with the Fifth Amendment. *State v. Earls*, 116 Wn.2d 364, 374-75, 805 P.2d 211 (1991). It is not broader. *Earls*, 116 Wn.2d at 374-75.

In *Earls*, our Supreme Court decided that the defendant "was repeatedly and clearly told of his right to have the assistance of an attorney. He freely, knowingly, and intelligently chose to give up that right and to confess to murder in exchange for a reduced charge." *Earls*, 116 Wn.2d at 380-81. One Justice dissented, relying in part on *Robtoy*, 98 Wn.2d 30. *Earls*, 116 Wn.2d at 383-84 (Utter, J. dissent). The dissent concluded that law enforcement violated Earls's right to counsel because the officers did not act on an equivocal invocation of the right to counsel. *Earls*, 116 Wn.2d at 383-84 (Utter, J. dissent). This reasoning was rejected by the eight other Washington Supreme Court justices. *Earls*, 116 Wn.2d at 380-81. Officers are not required to inquire further when a suspect merely uses the word "lawyer." *See Earls*, 116 Wn.2d at 380-81.

Horton's arguments are contrary to how Washington courts have consistently ruled, i.e., that the state constitutional protections under article 1, section 9, and the federal constitutional protections under the Fifth Amendment are the same. Conlon did not have a duty to inquire further into Horton's statements about lawyers. Additionally, Horton does not argue that under the Fifth Amendment, his right to counsel was violated, nor does he assign error under the Fifth

Amendment, thus conceding that his right was not violated under the federal constitution. Horton's claim fails. The trial court did not err.

II.     FLORIDA "WITHHELD ADJUDICATION"

Horton argues that a Florida "withheld adjudication" does not constitute a predicate offense for the crime of unlawful possession of a firearm in the first degree and, therefore, insufficient evidence existed to convict him. We conclude that in this circumstance the proper standard of review is a de novo legal review, not sufficiency of the evidence. We hold the court did not err.

A.     Standard of Review

Prior to the start of trial, a defendant may "move to dismiss a criminal charge due to insufficient evidence establishing a prima facie case of the crime charged." CrR 8.3(c).[12] This process is essentially a summary judgment procedure "to avoid a 'trial when all the material facts are not genuinely in issue and could not legally support a judgment of guilt.'"[13] *State v. Freigang*, 115 Wn. App. 496, 501, 61 P.3d 343 (2002) (quoting *Knapstad*, 107 Wn.2d at 356). The trial court "shall grant the motion if there are no material disputed facts and the undisputed facts do not establish a prima facie case of guilt." CrR 8.3(c)(3). The denial of such a motion is not appealable under RAP 2.2. CrR 8.3(c)(3). However, a defendant is not barred from claiming insufficient evidence at a later stage in the proceedings. *State v. Jackson*, 82 Wn. App. 594, 608, 918 P.2d 945

---

[12] Subsequent to *Knapstad*, the Supreme Court adopted a court rule outlining the procedures to be employed. *See* CrR 8.3(c)(1). Nonetheless, these motions are often referred to as *Knapstad* motions. We will review this issue under CrR 8.3.

[13] To properly file this type of motion, it must be in writing and supported by an affidavit or declaration alleging that there are no material disputed facts. CrR 8.3(c)(1). It must set out the agreed facts or be a stipulation to facts by both parties. CrR 8.3(c)(1).

(1996). We analyze the claim using the most complete factual basis available at the time the claim is made. *Jackson*, 82 Wn. App. at 609.

Whether or not a conviction can be a predicate offense is a question of law. *State v. Chambers*, 157 Wn. App. 465, 477, 237 P.3d 352 (2010). We review questions of law de novo. *State v. Gardner*, 104 Wn. App. 541, 543, 16 P.3d 699 (2001). We also review questions of statutory construction de novo, looking first to the statute's plain language in order to give effect to legislative intent. *State v. J.P.*, 149 Wn.2d 444, 449-50, 69 P.3d 318 (2003). We must give words in a statute their plain and ordinary meaning. *J.P.*, 149 Wn.2d at 450.

B.      Reviewability

First, the State contends that if we look at this issue as a sufficiency of the evidence claim, Horton failed to designate the appropriate portions of verbatim report of proceedings from the first trial and therefore, we cannot review the issue. Specifically, the State argues that because we do not have the trial record, Horton's conviction could have been based on a different prior conviction.

However, this argument is without merit. The State informed the court pretrial that the predicate offense for unlawful possession of a firearm "is a conviction out of Florida for robbery." RP (March 18, 2014) at 146. The jury instructions from the first trial also specify the predicate crime was the Florida offense.[14] It is clear from the record that the only predicate offense was the Florida "withheld adjudication." The State has not argued that the record is otherwise insufficient for our review.

---

[14] Additionally, in the second trial, Horton filed a motion in limine to preclude the State from discussing his Florida offense, which "constitute[ed] a conviction for the purposes of Count 2." CP at 325. It was an agreed motion, the trial court granted.

14

The State also argues that the motion to dismiss was a *Knapstad*, or CrR 8.3 motion, that cannot be appealed.[15] While we agree that denial of a CrR 8.3 motion cannot be appealed, the Criminal Court Rules provide, "These rules are intended to provide for the just determination of every criminal proceeding. They shall be construed to secure simplicity in procedure, fairness in administration, effective justice, and the elimination of unjustifiable expense and delay." CrR 1.2. Additionally, we follow the Rules of Appellate Procedure that state, "These rules will be liberally interpreted to promote justice and facilitate the decision of cases on the merits." RAP 1.2(a). Based on these rules, we exercise our discretion to consider the argument.

In so doing, however, we must determine the appropriate standard of review. Under a sufficiency of the evidence standard, we determine if any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt when viewing the evidence in the light most favorable to the State. *State v. Ehrhardt*, 167 Wn. App. 934, 943, 276 P.3d 332 (2012). If we are determining the issue as purely a matter of law, then we employ a de novo standard. *Gardner*, 104 Wn. App. at 543. Here, it is clear that Horton is in fact asking for a legal review of whether or not a robbery conviction under Florida's withheld adjudication statute can be a predicate offense for the crime of unlawful possession of a firearm in Washington. Because this issue is a narrowly defined legal issue, we review it de novo.

---

[15] For all intents and purposes, Horton's pretrial motion appears to have been a CrR 8.3(c) or a *Knapstad* motion. Defense counsel initially filed it as a motion in limine, but after the trial court stated the issue needed to be adequately briefed, defense counsel filed a brief seeking the dismissal of a charge, in writing, with an attached brief. Additionally, the State treated it as such, as did defense counsel and the court. Horton also did not take the opportunity in his reply brief to this court to refute the State's treatment of the motion as a *Knapstad* motion.

C. Unlawful Possession of a Firearm

The issue of whether or not a Florida withheld adjudication qualifies as a predicate offense for unlawful possession of a firearm is an issue of first impression. The only Washington case addressing Florida's withheld adjudication statute is *State v. Heath*, 168 Wn. App. 894, 279 P.3d 458 (2012). There, the court considered whether "withheld adjudications" should count toward an offender score. *Heath*, 168 Wn. App. at 895. The court reasoned that Heath's no contest pleas were functionally the same as guilty pleas, and that "Washington must count them as convictions, just as Florida does. Even when followed by a withhold of adjudication, they meet the Washington definition of a conviction."[16] *Heath*, 168 Wn. App. at 900-01 (internal quotations omitted). Horton acknowledges this holding but argues that the trial court here improperly determined that his guilty plea to robbery, combined with a withheld adjudication, constituted a conviction for the purposes of the unlawful possession of a firearm statute.

Under RCW 9.41.040(1)(a), "A person, whether an adult or juvenile, is guilty of the crime of unlawful possession of a firearm in the first degree, if the person owns, has in his or her possession, or has in his or her control any firearm after having previously been convicted or found not guilty by reason of insanity in this state or elsewhere of any serious offense as defined in this chapter." For the purposes of the statute, "convicted" is defined as follows:

> [A] person has been "convicted", whether in an adult court or adjudicated in a juvenile court, *at such time as a plea of guilty has been accepted*, or a verdict of guilty has been filed, notwithstanding the pendency of any future proceedings including but not limited to sentencing or disposition, post-trial or post-fact-finding motions, and appeals. Conviction includes a dismissal entered after a period of probation, suspension or deferral of sentence, and also includes equivalent dispositions by courts in jurisdictions other than Washington [S]tate. A person shall

---

[16] The appellate court in *Heath* reviewed two of the trial court's findings after a Florida prosecutor provided expert testimony about "withheld adjudication," and then reviewed the trial court's conclusion of law. 168 Wn. App. at 896-97.

not be precluded from possession of a firearm if the conviction has been the subject of a pardon, annulment, certificate of rehabilitation, or other equivalent procedure based on a finding of the rehabilitation of the person convicted or the conviction or disposition has been the subject of a pardon, annulment, or other equivalent procedure based on a finding of innocence.

RCW 9.41.040(3) (emphasis added).

"[I]n Florida, a statute gives the court discretion either to 'adjudge the defendant to be guilty or stay and withhold the adjudication of guilt.'" *Heath*, 168 Wn. App. at 898 (quoting FLA. STAT. ANN. § 948.01(2)). Additionally, Florida law defines "conviction" generally "as 'a determination of guilt that is the result of a plea or a trial, regardless of whether adjudication is withheld.'" *Heath*, 168 Wn. App. at 899 (quoting FLA. STAT. ANN. § 921.0021(2)).

Horton argues that because Florida does not consider a "withheld adjudication" a conviction for the purposes of possession of a firearm, Washington courts should do the same. Br. of Appellant at 30. Florida's unlawful possession of a firearm statute, FLA STAT. ANN. § 790.23(1), states it is unlawful for any person who has been convicted of a felony to have in his possession any firearm. Horton cites *Castillo v. State*, 590 So. 2d 458, 461 (Fla. Dist. Ct. App. 1991), where the Florida court held, "For purposes of this statute, we construe 'conviction' to mean an adjudication of guilt." (Internal quotation omitted.). The court went on to state, "Where adjudication has been withheld, the offender is not a convicted felon." *Castillo*, 590 So. 2d at 461.

However, Washington courts do not adopt a foreign jurisdiction's interpretation of law. *State v. Stevens*, 137 Wn. App. 460, 465, 153 P.3d 903 (2007). We instead interpret foreign statutes in light of Washington statutes and case law. *Stevens*, 137 Wn. App. at 465. We (1) identify the comparable Washington offense, (2) classify the comparable Washington offense, and

17

(3) treat the out-of-state conviction as if it were a conviction for the comparable Washington offense. *Stevens*, 137 Wn. App. at 465. Because Washington law controls, not the interpretation conducted by another state, we do not look to Florida law but to how Washington law treats the same conduct. *State v. Cameron*, 80 Wn. App. 374, 379, 909 P.2d 309 (1996).

Furthermore, the plain language of RCW 9.41.040(3) defines a "conviction" as when "a plea of guilty has been accepted." The statute also provides that a conviction "includes a dismissal entered after a period of probation, suspension or deferral of sentence, and also includes equivalent dispositions by courts in jurisdictions other than Washington [S]tate." RCW 9.41.040(3). We conclude that a plea of guilty combined with a withheld adjudication is a conviction for the purposes of being a predicate offense for unlawful possession of a firearm.[17]

There is no dispute that Horton pleaded guilty to the armed robbery in Florida. In 1994, Horton pleaded guilty and the court entered a sentence of "adjudication withheld." Horton stipulated to the documents proving his Florida offense at trial. Therefore, we affirm Horton's conviction.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

---

[17] We also previously considered Texas "deferred adjudications" as convictions for the purposes of offender score calculations "because, despite not having 'entered' the[] adjudications, the Texas court had accepted [the defendant's] guilty pleas to these charges." *State v. Cooper*, 164 Wn. App. 407, 408, 263 P.3d 1283 (2011), *aff'd*, 176 Wn.2d 678, 294 P.3d 704 (2013).

ADDITIONAL FACTS

I.      THE FIRST TRIAL—MOTIONS IN LIMINE

Prior to the start of Horton's first trial, Horton filed pretrial motions to suppress or exclude his prior convictions and his own gang affiliation.[18]  The trial court denied his motion to exclude his gang affiliation.

The State also filed motions in limine, which in pertinent part argued that Pitts's prior contact with law enforcement should be excluded absent an offer of proof.  Horton argued that Pitts's affiliation to a gang was important to the defense's case.  The court ruled, "As it relates to motive, whether or not Mr. Pitts was a member of a gang is irrelevant.  What's relevant is what was in Mr. Horton's mind.  If Mr. Horton thought that Mr. Pitts was a member of a gang and because of that, because that had anything to do with his actions, that's what's relevant."  RP (March 26, 2014) at 11.

II.     THE SECOND TRIAL

After the jury in the first trial failed to reach a verdict on the murder charge, a second trial began on May 29, 2014.  The parties filed an agreed motion to not discuss the prior conviction for unlawful possession of a firearm.  The trial court reserved ruling on the issue of instructing the jury on the gang aggravator attached to the charge of unlawful possession of a firearm.

A.      Pretrial Motions in Limine

Both parties renewed some of the same motions they made in the first trial.  Regarding these, the court said, "I don't intend to change my decision absent some new argument."  2 RP at 42.  The parties did not relitigate the pretrial motion to exclude Horton's gang affiliation decided

---

[18] Horton cited ER 404(b), 802, 402, 403, and 602, as well as 609.

in the first trial. However, several times throughout the trial, Horton asked the court to reconsider whether Pitts's gang affiliation was admissible.

During Johnson's testimony in the State's case in chief, he told the jury that Horton and Pitts did not know each other well, only in passing. On cross-examination, Johnson was asked about Horton's involvement in a gang. Johnson testified that he knew Horton had previously been a member of the BGDs in Chicago. He did not know if Horton associated with gang members. When asked, Johnson said he knew Pitts was associated with a street gang. The State objected, and the court sustained the objection and granted the motion to strike the response.

Outside the jury's presence, Horton asked why the objection had been sustained. Horton then argued its relevance was to the gang aggravator and to show Horton misidentified Pitts's gang. Horton pointed out that the video recording from the patrol car was played for the jury in which Horton stated Pitts was in a specific gang. Horton argued that Johnson could speak to whether the BGDs and the Lakewood Crips were actually rivals. The trial court stated,

> [I]t doesn't matter whether or not Mr. Pitts was a member of a gang. I think what matters is what Mr. Horton thought, and if Mr. Horton thought he was a member of a gang, that's certainly relevant, and that's already before the jury. So where are we going with it, though, is my question with regard to Mr. Johnson because whatever Pitts may have told Johnson or whatever is in Johnson's mind, I would agree, is not really relevant since Mr. Johnson wasn't in the altercation between Pitts and Horton.

5 RP at 479-80.

Shortly thereafter, Horton informed the court he intended to ask Johnson about Pitts's chest tattoo that read "Lakewood Crip." 5 RP at 482. He argued that it demonstrated conflicting testimony existed about whether or not Pitts had his shirt off in the apartment. Johnson testified that Pitts had his shirt off in the apartment and his tattoos would be visible to Horton. Horton argued that because he later misidentified Pitts's gang, he did not see Pitts's chest; thus, Pitts did

not have his shirt off. The court ruled the evidence Horton intended to elicit from Johnson was irrelevant.

Horton also objected to the State redacting a diagram created by the medical examiner, so that the jury would not see the large tattoo across Pitts's chest. Horton argued the tattoos were relevant because testimony came in that he and Pitts were in the same room with their shirts off and yet Horton thought Pitts was in a different gang than the one tattooed across his chest. The trial court ruled, "To the extent that [the defense attorney] said he should be able to elicit what Mr. Horton could see and so forth, that isn't this, as I think I've explained before. The only person that can say what he could see or didn't see or did see or didn't see is Mr. Horton. I don't see how a medical examiner could testify to that." 7RP at 809.

Horton again argued, "I think the presence or absence of a tattoo on his chest when I've gone into great detail with witnesses about lighting conditions, about who was closer to the body, about who had their shirts off and who didn't . . . is relevant." 7 RP at 811-12. Horton argued that he would not have told the officers in the car that Pitts was a "Hilltop Crip[ ]" if he had seen Pitts's chest. 7 RP at 815. The court ruled that it still did not see the relevance and said that "[w]hether Mr. Horton was right or not is, quite frankly, also irrelevant. It's just what he thought or what he believed on October 24th, 2012, as to Mr. Pitts, and that has to come from Mr. Horton." 7 RP at 820. The court further said that if Horton testified, he could discuss the photo and the tattoo.

Finally, after interviewing Borja and Ross, Horton moved to either exclude any reference to everybody's gang involvement or to allow him to elicit from them what they knew about the respective gangs. Horton argued that because the State was going to play the video-recorded interview in which Horton talks about gangs, the defense should be allowed to corroborate

Horton's statements.[19] He argued the defense's theory of the case was that Pitts threatened Horton based on gang relationships, and therefore, he should be able to prove the fact through evidence Pitts was a gang member. Horton also argued that the evidence was admissible under ER 404(b) to prove motive.

After hearing argument from both sides, the trial court ruled it would allow Horton to inquire as to who was all together and the things leading up to the point in time when Borja left. This included relationships and how they were getting along. The court ruled, "But, again, it's what was in the mind of Mr. Horton. I don't think it matters one bit whether or not anybody really was a member of a gang except for Mr. Horton because the State has to prove that in order to prove their aggravator, their gang aggravator, because if he's not a member of a gang, then their aggravator fails necessarily." 8RP at 982.

Borja testified that he did not believe the incident was gang related. Horton also asked if the actions were in retaliation for being in a gang, and Borja answered, "No." 9 RP at 1114. Borja testified that he was aware of everyone's gang status and that as far as he was aware, the other people in the room also knew everyone's gang status. Horton asked what gangs they belonged to or used to belong to, the State objected, and the court overruled. Borja stated his own affiliation and Horton's but the State objected before he could provide Pitts's affiliation. Horton again argued the evidence was admissible under ER 404(b) to show motive as to why Pitts attacked Horton. The court permitted the witnesses to speak only to what they saw. The court declined to strike Borja's answers to the prior questions but sustained the objection to the question about Pitts.

---

[19] The State referenced the video-recorded interview in its opening statement.

Shortly thereafter, Horton asked Borja if he ever heard Pitts say "cuz," and Borja answered that he had. 9 RP at 1125. Borja said Pitts would not say that to him because "just the nature of the—you know, how it is and I'm a Blood and he's a Crip and out of respect, we wouldn't do that. If he was to disrespect me, say that to me, we got problems." 9 RP at 1126. The State objected to both questions, and the court overruled both objections.

B.      Jury Instructions

Horton proposed jury instructions for manslaughter. The proposed instructions stated that if the jury could not find beyond a reasonable doubt that Horton was guilty of murder in the first degree, it should consider whether he was guilty of manslaughter in the first or second degree.

Horton argued he had testified that he did not intend to kill Pitts. Instead, he intended to just stop him. To the extent that he intended to shoot Pitts and not kill him, a jury could find he acted recklessly or negligently in causing Pitts's death. Horton also argued that a jury could find from the evidence that he did not intend to kill Pitts and that he exercised self-defense. He added that a jury could find he recklessly or negligently used more force than was necessary.

Horton testified at trial, "I never had an intention to kill anybody that night." 11 RP at 1489. He explained that when he pulled the trigger on the gun, "I wanted [Pitts] to stop attacking me." 11 RP at 1489. Horton also stated he did not realize he shot Pitts twice. Additionally, Horton admitted to being on Ecstasy at the time. Other evidence demonstrated Horton was very intoxicated that night, both at the club and at Johnson's apartment.

The trial court declined to give Horton's manslaughter instructions, finding that the factual prong of the *Workman*[20] test was not satisfied. The court distinguished Horton's actions from

---

[20] *State v. Workman*, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978).

recklessness stating, "This is different. This is, to me, not a reckless act where he just shot into a group of people." 11 RP at 1640. The court also considered *State v. Perez-Cervantes*, 141 Wn.2d 468, 6 P.3d 1160 (2000). Horton argued that the case was distinguishable, but the court stated, "I do not see how taking a gun and shooting it at a person a short distance from you—I don't know the—none of us know the actual distance, but it couldn't be very big because that apartment wasn't very big—could in any way be reckless as opposed to intentional. So I'm not going to give the proposed lesser included of manslaughter, first or second." 11 RP at 1646-47. The court instructed the jury on first and second degree murder.

C.     Closing Argument

During closing argument, the State brought special attention to Horton's mental state and whether or not the State had successfully proved premeditation. Specifically, the State addressed the events that transpired after the shooting. The State argued,

> If you have any doubt about what his intent was, after he shoots Mr. Pitts and Mr. Pitts is no longer a threat, does he render aid? Does he call 911? Does he do anything to suggest to you that he wants to save this man's life? No. He's perfectly happy letting Mr. Pitts bleed out on the ground and die, and if you have any question about what his intent was when he shot Mr. Pitts, he's standing over the body with the gun jammed, yelling, "I'm going to kill you, m*****f***er." Laughing when he thinks that the m*****f***er is dead. He's laughing because it's funny to him because he did what he sought to do which was kill Mr. Pitts.

12 RP at 1690.

The State went on to argue that premeditation

> [m]ust be more than a moment in time. Two moments is sufficient. When you pick up a gun and you shoot someone once, in that moment, you intend to kill. It's a single moment, but when you continue beyond that moment in additional moments and do things intending to kill, you deliberate. You decided in your head this man needs to die, and when you have multiple moments where you're still thinking about it and you're still doing things with the intent to kill, that's premeditation.

24

12 RP at 1692. The State argued that two shots showed Horton acted with premeditation. It quoted

Horton's language, arguing that it showed Horton thought about killing Pitts. It argued,

> "Trying to test me. Test my gangsta. Nah, dude, get the fuck up out of here, dude." This is the defendant saying, in his head, when he shoots Mr. Pitts, he's decided, You're testing me; you're testing my gangsta. Nah, you're not going to do that; I'm going get my gun and shoot you. That's premeditation, the moments of deliberation in his head. It doesn't stop there.
>
> The defendant: "And I'm going to tell you. No bullshit. I'm not gonna— I'm not gonna waste no paperwork on you. Nothing, man. N*****, I shot him. I shot him 'cause he deserved it. Fuck, n*****. Deserved it." This is him, again, in his head saying he deliberated. He thought about it. He decided this man deserves to die. That is premeditation.

12 RP at 1695.

> The State then returned to the events after the shooting saying,

> What about everything that happens after the gunshot? Here's another great misnomer in this case. You're led to believe that premeditation could have only been formed before the shots were fired; that in the moments that he pulled the trigger, that in and of itself determines first degree and second degree murder and self[-]defense. That is incorrect.
>
> Look at your jury instructions. Here's the 'to convict' instruction for first degree murder. "No. 1, the defendant acted with the intent to cause the death of Charles Pitts." Did he do anything after he shot Mr. Pitts? Did he act in any way? Did his actions during that time reflect an intent to cause the death of Mr. Pitts, and was that intent to cause the death premeditated? Did he do things after he shot Mr. Pitts intending to kill that man, and was it premeditated and if he did things after he shot Mr. Pitts, after there was no longer a need for self[-]defense even if you believed his story, he's still guilty of first degree murder and second degree murder.

12 RP at 1696-97.

> The State continued:

> [H]e was acting even after he shot Mr. Pitts and even after Mr. Pitts was no longer a threat, and his actions were done with the intent to kill Mr. Pitts, and during that entire time from the time that he shot Mr. Pitts to the time that he's caught by the police, during that entire time, he's premeditated, he's deliberating, he's decided this man needs to die.

12 RP at 1697-98.  The State finally stated, "So, again, don't be fooled by any notion that the analysis of whether this defendant is guilty stops at the moment that he pulls the trigger."  12 RP at 1698.  The State concluded this strain of argument by saying, "It continues from the moment he pulls the trigger until the moment that he's apprehended by the police."  12 RP at 1698.  Defense counsel did not object to any of the State's arguments.

Defense argued in response, "Nowhere in your instructions are you going to see any indication that you can form the intent after the fact."  12 RP at 1739.  Defense counsel stated that the evidences proves the shot to the heart in the apartment was the fatal shot and, "to suggest that somehow because he was angry at the man whose life he had to take and was threatening him is to suggest that he formed the intent after the fact, is inconsistent with the law and inconsistent with the evidence that you all heard."  12 RP at 1739.  The State objected on the grounds that defense counsel misstated the law, and the court sustained the objection.

Defense counsel then continued on,

> I guess—the State's going to get another opportunity to give a closing argument and I guess they'll show you in the jury instructions where it says that you can form the intent after the fact, but it seems to me that to move words around within the jury instructions to make them neatly fit into the State's theory of the case is not consistent with your obligation to presume the defendant innocent unless and until the State proves beyond a reasonable doubt that he intended to kill Mr. Pitts and that he did not act in self[-]defense.

12 RP at 1740.  Finally, defense counsel addressed the State's argument by saying, "The State talks about premeditation and they talk about how it could have been formed after the fact and that Baron Johnson is not the only way they can get to premeditation, and I just don't see that."  12 RP at 1804.

26

In rebuttal, the State again argued,

But when you think about circumstantial evidence, when you think about what the State has to prove, the State has to prove that not only was there not self[-]defense, but the defendant thought about it. He thought about what he was going to do before he did it; that he had a goal in mind for Mr. Pitts to die, and when you think about someone's mind, it's kind of hard to get in a person's mind, so you have to look at their actions, and even though they're not telling you something, which would be telling you what their intent is, telling you that they've thought about what they're going to do, sometimes you can see it through their actions. The defendant drug Mr. Pitts out in the parking lot, and he went back in the house, got dressed, retrieved his gun and he stood over Mr. Pitts' body and said "I'm going to kill you, m*****f***er." That's important because when you're wrestling with this idea of premeditation, you're going to be looking for something inside the house, that direct evidence inside the house when he got that gun and shot Mr. Pitts, but then there's circumstantial evidence, and it refers to evidence from which, based on common sense and experience you may reasonably infer something. You can infer something.

12 RP at 1832-33.

The State continued:

[Horton] thought Mr. Pitts was still alive. And as he was standing over there, the cop said when he said, "I'm going to kill you, m*****f***er"—and I keep repeating it because it's, in essence, the key to this case because you can infer, based on your common sense and experience, you may reasonably infer something that is at issue in this case, and that is, what was his intent? Well, when he was standing over the body, what was his intent when he articulated it? "I'm going to kill you." When he got dressed and came back to the body, that shows that he had more than a moment in time. He was still thinking about it. If circumstantial evidence—and there's no distinction between the weight or value in considering those two concepts of evidence, direct—direct would be me telling you or you seeing a plan written out. Circumstantial is his actions and his words that can be taken into consideration, what he did afterwards. That's the importance.

12 RP at 1833-34. The State concluded, "Because if you find that it did happen, you have to find premeditated murder, murder in the first degree." 12 RP at 1834.

ANALYSIS

I. GANG EVIDENCE

Horton argues that the trial court abused its discretion by excluding evidence of Pitts's gang affiliation and violated his right to present a defense. We disagree.

A. Standard of Review

The fundamental due process right to present a defense includes the right to offer testimony. *State v. Lizarraga*, 191 Wn. App. 530, 552, 364 P.3d 810 (2015), *review denied*, 185 Wn.2d 1022 (2016). However, a defendant's right to present testimony is not absolute. *Lizarraga*, 191 Wn. App. at 552. "'The accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.'" *Lizarraga*, 191 Wn. App at 553 (quoting *Taylor v. Illinois*, 484 U.S. 400, 410, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988)). "Evidentiary 'rules do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve.'" *Lizarraga*, 191 Wn. App. at 553 (internal quotations omitted) (quoting *United States v. Scheffer*, 523 U.S. 303, 308, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998)).

We review a trial court's evidentiary rulings on relevance for abuse of discretion. *State v. Hall*, 112 Wn. App. 164, 169, 48 P.3d 350 (2002). A trial court's ruling under ER 404(b) will not be disturbed absent a manifest abuse of discretion. *State v. Mason*, 160 Wn.2d 910, 933-34, 162 P.3d 396 (2007). A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons. *State v. Lord*, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007). A trial court also abuses its discretion when it relies on unsupported facts, takes a view that no reasonable person would take, applies an incorrect legal standard, or bases its ruling on an erroneous legal view. *Lord*, 161 Wn.2d at 284.

B.      Right to Present a Defense

Horton contends the trial court's decision to exclude Pitts's gang affiliation was manifestly unreasonable.[21]  We disagree.

Gang evidence falls within the scope of ER 404(b).  *State v. Yarbrough*, 151 Wn. App. 66, 81, 210 P.3d 1029 (2009).  Courts consider evidence of gang affiliation prejudicial.  *State v. Embry*, 171 Wn. App. 714, 732, 287 P.3d 648 (2012).  Therefore, there must be a nexus between the crime and the gang membership evidence before the trial court may find the evidence relevant.  *State v. Scott*, 151 Wn. App. 520, 526, 213 P.3d 71 (2009).  Courts may admit gang affiliation evidence to establish the motive for a crime or to show that defendants acted in concert.  *Scott*, 151 Wn. App. at 527.

A trial court may admit gang evidence offered for proof of motive, intent, or identity.  *Yarbrough*, 151 Wn. App. at 81.  In determining the admissibility of ER 404(b) evidence, a trial court must (1) find by a preponderance of the evidence that misconduct occurred; (2) identify the purpose for which the evidence is sought to be introduced; (3) determine whether the evidence is relevant to prove an element of the crime charged; and (4) weigh the probative value against the prejudicial effect.  *Yarbrough*, 151 Wn. App. at 81-82.  In Horton's case, the trial court excluded the proffered gang evidence based on relevancy.

---

[21] Horton states in his brief that the trial court "granted the State's motion to exclude evidence that Pitts was affiliated with a gang," but provides no citation.  Br. of Appellant at 32.  This argument does not accurately reflect what occurred in the trial court.  The issue arose many times over the course of the two trials, both pretrial and during trial.  As a result, it seems that Horton is not appealing one solitary ruling by the trial court but individual instances when the court made evidentiary rulings in response to a motion or objection.  Horton moved on many occasions for the admission of Pitts's gang affiliation; however, he only occasionally referenced ER 404(b).  The court decided the issue in each instance under relevance and our analysis follows suit.

Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. "All relevant evidence is admissible, except as limited by constitutional requirements or as otherwise provided by statute, by these rules, or by other rules or regulations applicable in the courts of this state. Evidence which is not relevant is not admissible." ER 402.

Horton argues that Pitts's gang affiliation was relevant because it established motive for Pitts attacking Horton and corroborated Horton's version of events. Horton also argues that Pitts's gang affiliation was established by a preponderance of the evidence, and would have provided context for and supported Horton's self-defense theory. He also argues it was highly probative and was not unduly prejudicial. Horton cites to three specific instances where the court excluded evidence of Pitts's gang affiliation.

First, Horton cites to when defense counsel asked Johnson about Pitts's gang affiliation. Horton argued the information was relevant because the State had charged a gang aggravator. After Horton argued that Johnson could address whether the BGDs and the Lakewood Crips were actually rivals, the court ruled, "I think it doesn't matter whether or not Mr. Pitts was a member of a gang. I think what matters is what Mr. Horton thought, and if Mr. Horton thought he was a member of a gang, that's certainly relevant, and that's already before the jury." 5 RP at 479-80. Horton did not provide an adequate reason why the evidence was relevant. The trial court's ruling did not abuse its discretion by excluding it.

Next, Horton cites to an instance during the State's case in chief, when Horton objected to the State's request to redact Pitts's gang tattoos in the medical examiner's diagram. Horton argued the redaction was inappropriate because a disputed fact existed as to whether or not Horton and

30

Pitts were in the same room with their shirts off slap boxing that night. Horton argued that his ability or inability to have seen Pitts's tattoo was highly relevant. The trial court ruled, "To the extent that [Horton] said he should be able to elicit what [he] could see and so forth, that isn't this, as I think I've explained before. The only person that can say what he could see or didn't see or did see or didn't see is Mr. Horton. I don't see how a medical examiner could testify to that." 7 RP at 809.

The court reiterated that "[w]hether Mr. Horton was right or not is, quite frankly, also irrelevant. It's just what he thought or what he believed on October 24th, 2012, as to Mr. Pitts, and that has to come from Mr. Horton." 7 RP at 820. The court added that it would not prevent Horton, if he took the stand, from testifying about the photo and the tattoo. The court's ruling was not an abuse of discretion. It appropriately found the evidence was not relevant for the purposes Horton was offering it. It also specified how defense counsel could use the evidence. We cannot say the court abused its discretion in this instance.

Finally, Horton cites to his request, after conducting an interview of Borja and Ross, to either exclude any reference to all parties' involvement in gangs or to allow the defense to elicit from them what they know about the respective gangs. Horton argued that the State was going to play a video recorded interview in which Horton talked about gangs and the defense should be allowed to corroborate Horton's statements in the video even if Horton did not testify at trial. Horton also argued that his theory of the case was that Pitts threatened him based on a gang relationship, and he should be able to prove that fact through evidence that Pitts was a gang member. Last, Horton argued that the gang evidence was admissible under ER 404(b) to prove motive.

The trial court ruled that it would allow the defense to inquire into who was all together the night of the shooting and the things leading up to the point in time when Borja left. The court stated that included relationships and how they were getting along. However, the court ruled, "But, again, it's what was in the mind of Mr. Horton. I don't think it matters one bit whether or not anybody really was a member of a gang except for Mr. Horton because the State has to prove that in order to prove their aggravator, their gang aggravator, because if he's not a member of a gang, then their aggravator fails necessarily." 8 RP at 982. We cannot say that the trial court's ruling was manifestly unreasonable or based on untenable grounds.

Horton attempts to compare his case to *State v. Boot*, 89 Wn. App. 780, 789, 950 P.2d 964 (1998), where the court held that evidence of prior bad acts was relevant and necessary because the purpose for which it was admitted was of consequence to the action. Here, the trial court did not exclude all evidence related to Pitts's gang affiliation, only the evidence it deemed irrelevant because it did not tend to prove or disprove the charge or self-defense.

Horton also relies on *State v. Campbell*, 78 Wn. App. 813, 821, 901 P.2d 1050 (1995); however, like *Boot*, in *Campbell*, the court considered the admissibility of gang evidence about the defendant and under those particular circumstances the court found the evidence relevant. We reemphasize that here, the trial court found that some of the purposes for which defense counsel attempted to elicit gang evidence about the victim were irrelevant. But the court did not entirely exclude Pitts's gang affiliation.

For example, when Borja testified, he stated he knew everyone's gang status and the incident was not gang related. After an objection, the trial court did not allow Borja to testify to Pitts's gang affiliation. Yet Horton asked if Borja had heard Pitts say "cuz," and he answered he had. 9 RP at 1125. Defense counsel also asked if Pitts would say that to Borja and Borja said no

32

because "just the nature of the—you know, how it is and I'm a Blood and he's a Crip and out of respect, we wouldn't do that. If he was to disrespect me, say that to me, we got problems." 9 RP at 1126. The State objected to both questions, and the court overruled the objections and allowed the testimony.

Horton also compares his case to *Yarbrough*, where the court held gang evidence was admissible to establish the defendant was motivated by his perception that the victim was associated with a rival gang. 151 Wn. App. at 84. Here, however, the trial court never ruled that Horton's perception of Pitts as a gang member was irrelevant. Nor, did the trial court rule gang evidence about Pitts was inadmissible to show Horton's state of mind. In fact, the trial court repeatedly ruled that the same justification articulated in *Yarborough* was the only way that Pitts's gang affiliation became relevant, to show Horton's knowledge and state of mind. We conclude that the trial court did not abuse its discretion.

II.    MANSLAUGHTER INSTRUCTIONS

Horton argues the trial court abused its discretion by declining to instruct the jury on manslaughter in the first and second degree as lesser included offenses to murder in the first degree. We disagree.

A.    Legal Principles

A defendant is entitled to jury instructions on lesser included offenses if each of the elements of the lesser offense is a necessary element of the offense charged and the evidence supports an inference that the lesser crime was committed. *State v. Workman*, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978). We review the trial court's determination on the legal prong of that test de novo and the factual prong for abuse of discretion. *State v. Walker*, 136 Wn.2d 767, 771-72, 966 P.2d 883 (1998). When determining if the evidence at trial was sufficient to support the giving

of an instruction, we view the supporting evidence in the light most favorable to the party that requested the instruction. *State v. Fernandez-Medina*, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000).

The second prong, the factual test, requires that a requested jury instruction on a lesser included or inferior degree offense should be given "[i]f the evidence would permit a jury to rationally find a defendant guilty of the lesser offense and acquit him of the greater." *State v. Warden*, 133 Wn.2d 559, 563, 947 P.2d 708 (1997). The evidence must raise an inference that only the lesser included/inferior degree offense was committed to the exclusion of the charged offense. *Fernandez-Medina*, 141 Wn.2d at 455.

It is not enough that the jury might disbelieve the evidence pointing to guilt. *Fernandez-Medina*, 141 Wn.2d at 456. The evidence must affirmatively establish the defendant's theory of the case. *Fernandez-Medina*, 141 Wn.2d at 456. However, the *Workman* test protects both the State's and the defense's right to argue their theory of the case. *State v. Berlin*, 133 Wn.2d 541, 548, 947 P.2d 700 (1997). If the evidence supports an inference the lesser included offense was committed, and that the failure to give an instruction on it prevented the defendant from presenting his theory that a killing was unintentional, it is reversible error. *Warden*, 133 Wn.2d at 564.

B.     Lesser Included Offenses

The parties correctly agree that the legal prong of the *Workman* test is satisfied; therefore, we only address the factual prong. *See State v. Condon*, 182 Wn.2d 307, 317, 343 P.3d 357 (2015) (manslaughter is a lesser included of premeditated murder). Horton argues that from the evidence presented at trial, a jury could find Horton accidentally inflicted the fatal wound as a result of negligence or recklessness with firing the gun, thus entitling him to a lesser included offense

34

instruction on manslaughter. He also contends that the issue implicates his right to present a complete defense.

A person is guilty of manslaughter in the first degree when he recklessly causes the death of another person. RCW 9A.32.060(1)(a). A person is guilty of manslaughter in the second degree when he causes the death of another with criminal negligence. RCW 9A.32.070(1).

In deciding not to give any manslaughter instructions, the trial court relied on *Perez-Cervantes*, 141 Wn.2d 468, which Horton attempts to distinguish. In *Perez-Cervantes*, the appellant stabbed the victim twice in the chest. 141 Wn.2d at 471. The court reasoned that the appellant could not "overcome the presumption that an actor intends the natural and foreseeable consequences of his conduct," and that he could not show from the evidence presented that he meant to assault the victim but not kill him. *Perez-Cervantes*, 141 Wn.2d at 481-82.

Here, the trial court similarly stated it would not give lesser included instructions because Horton did not satisfy the factual prong of the *Workman* test. It reasoned that factually, the evidence showed Horton intended to kill Pitts and not just assault him. Horton's attempt to distinguish *Perez-Cervantes* fails.

The evidence, when taken in the light most favorable to Horton, shows that he had consumed both alcohol and Ecstasy on the night of the shooting. The evidence also shows that Horton pointed the gun at Pitts and fired it intentionally. It shows that after dragging Pitts's body outside, Horton stood over the body yelling that he wanted Pitts dead. Although Horton testified to his intoxication, to his not intending to actually kill Pitts, and to his not remembering shooting Pitts more than once, the court did not find the evidence presented raised an inference that Horton lacked intent.

It is not enough that the jury might disbelieve the evidence pointing to guilt; the evidence must affirmatively establish the defendant's theory of the case. *Fernandez-Medina*, 141 Wn.2d at 456. The court instructed the jury on both first and second degree murder. The jury found Horton guilty of first degree murder. Where a trial court instructs the jury on first and second degree murder and the jury finds the defendant guilty of first degree murder, no prejudice can be shown from lack of a manslaughter instruction. *State v. Guilliot*, 106 Wn. App. 355, 368-69, 22 P.3d 1266 (2001). Horton cannot show prejudice. We conclude that the trial court's decision was not manifestly unreasonable or based on untenable grounds, and thus, the trial court did not abuse its discretion.

III.     PROSECUTORIAL MISCONDUCT

Horton argues the prosecutor erred by misstating the law during closing argument. While we agree that one of the prosecutor's challenged statements improperly stated the law, the other three did not. Because a curative instruction would have cured the improper statement and Horton has not shown prejudice, we reject Horton's claim.

A.     Standard of Review

To assert a claim of prosecutorial misconduct, the defendant bears the burden of proving that the prosecutor's conduct was both improper and prejudicial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). The threshold question is whether the prosecutor's arguments were improper. *Thorgerson*, 172 Wn.2d at 442.

Once a defendant establishes that a prosecutor's statements were improper, we determine whether the defendant was prejudiced under one of two standards of review. *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). If the defendant objected at trial, the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of

affecting the jury's verdict. *State v. Anderson*, 153 Wn. App. 417, 427, 220 P.3d 1273 (2009). Absent a proper objection, however, the defense waives the issue of misconduct unless the comment was so flagrant or ill-intentioned that an instruction could not have cured any prejudice. *Anderson*, 153 Wn. App. at 427. We review the prosecutor's comments during closing argument in the context of the entire argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. *State v. Sakellis*, 164 Wn. App. 170, 185, 269 P.3d 1029 (2011).

B.     Misstatement of the Law

Horton argues that the prosecutor misstated the law by arguing to the jury that if it found Horton formed the intent to kill after shooting Pitts, and he deliberated on the intent for a moment after he shot Pitts, that was premeditation. Specifically, Horton claims the misconduct relates to three statements the prosecutor made during closing argument and one during rebuttal closing argument.[22]

In the second and third statements Horton identifies from the State's closing, the prosecutor instructed the jury to look to the instructions, argued the relevance of circumstantial evidence to the case, and emphasized that the jury could use Horton's actions after he pulled the trigger to better understand his intent beforehand. In one instance the prosecutor said, "[D]on't be fooled by any notion that the analysis of whether this defendant is guilty stops at the moment that he pulls the trigger." 12 RP at 1698. But the statement was made in the context of circumstantial evidence.

Horton also quotes the italicized portion of the below quote from the State's rebuttal:

> [Horton] thought Mr. Pitts was still alive. And as he was standing over there, the cop said when he said, "I'm going to kill you, m*****f***er"—and I keep repeating it because it's, in essence, the key to this case because you can infer, based on your common sense and experience, you may reasonably infer something that is at issue in this case, and that is, what was his intent? Well, when he was standing

---

[22] Horton did not object to any of the statements at trial.

over the body, what was his intent when he articulated it? "I'm going to kill you." *When he got dressed and came back to the body, that shows that he had more than a moment in time. He was still thinking about it.* If circumstantial evidence—and there's no distinction between the weight or value in considering those two concepts of evidence, direct—direct would be me telling you or you seeing a plan written out. Circumstantial is his actions and his words that can be taken into consideration, what he did afterwards. That's the importance.

12 RP at 1833-34 (emphasis added). In the context of the full statement, we conclude that the prosecutor's comments are not improper.

In the context of the entire argument, the issues, the evidence addressed, and the jury instructions, the prosecutor did not act improperly in making the afore-mentioned statements. The prosecutor was explaining the role of circumstantial evidence in determining premeditation. Although sometimes inartful, the prosecutor consistently referred back to the jury instructions and did not misstate the law.

As to the other statement that Horton argues was error, we conclude that the prosecutor's statement was improper. In that statement, the prosecutor argued,

What about everything that happens after the gunshot? Here's another great misnomer in this case. You're led to believe that premeditation could have only been formed before the shots were fired; that in the moments that he pulled the trigger, that in and of itself determines first degree and second degree murder and self[-]defense. That is incorrect.

12 RP at 1696. Here, the prosecutor misstated the law in explaining that Horton could have formed the requisite intent after he pulled the trigger.

Horton next argues that the statements likely misled the jury and that there was a substantial likelihood the prosecutor's actions impacted the jury's verdict. He contends that the elements of murder in the first degree are well defined and that there was no basis for the State's argument. He asserts the State's version of the law could lead the jury to convict Horton "even if it believed

Horton did not intend to kill Pitts when he fired the fatal shot." Br. of Appellant at 50. And further, he argues that no instruction could have cured this error.

Because Horton did not object, he has waived the issue of misconduct unless he can show that the comments were so flagrant or ill-intentioned that an instruction could not have cured any prejudice. *Anderson*, 153 Wn. App. at 427. First, based on the record and Horton's arguments, there is no showing of flagrancy or ill-intent. Second, we look at the combination of the prosecutors' statements to the jury to review the jury instructions, Horton's statement to the jury to rely on the premeditation jury instructions, the evidence, and the instructions themselves, including the one on circumstantial evidence. In so doing, we conclude that an instruction likely would have cured any prejudice and that Horton has not demonstrated prejudice.

C.      Ineffective Assistance of Counsel

Horton argues that if his prosecutorial misconduct claim fails for lack of an objection, he was denied effective assistance of counsel. To prove ineffective assistance of counsel, an appellant must show that (1) counsel's performance was so deficient that it fell below an objective standard of reasonableness and that (2) the deficient performance prejudiced him, to the extent that there is a reasonable probability the deficient performance affected the outcome of the trial. *State v. Thomas*, 109 Wn.2d 222, 226, 743 P.2d 816 (1987). Failure to establish either prong is fatal to an ineffective assistance of counsel claim. *Strickland v. Washington*, 466 U.S. 668, 700, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). We conclude that Horton's ineffective assistance of counsel claim fails because he cannot demonstrate prejudice to support his prosecutorial misconduct claim. Therefore, Horton did not receive ineffective assistance of counsel.

IV.    CUMULATIVE ERROR

Horton argues that cumulatively, his improperly admitted statements, the erroneously excluded evidence, the declined manslaughter jury instruction, the prosecutor's misstatement of the law on premeditation in closing, and defense counsel's failure to object to the prosecutor's misconduct, denied him his right to a fair trial.

Under the cumulative error doctrine, we may reverse a defendant's conviction when the combined effect of errors during trial effectively denied the defendant his right to a fair trial, even if each error standing alone would be harmless.  *State v. Venegas*, 155 Wn. App. 507, 520, 228 P.3d 813 (2010).  Cumulative error does not apply where the errors are few and have little or no effect on the outcome of the trial.  *Venegas*, 155 Wn. App. at 520.

Because we conclude that Horton was not prejudiced in each of his individual assignments of error, we also conclude he is not entitled to relief under the cumulative error doctrine.

We affirm.

 

 

_____
              Melnick, J.

We concur:

 

_____
     Worswick, P.J.

 

_____
     Lee, J.